Edward Francis CRAWFORD,
Appellant,

v.

The STATE of Texas, Appellee.

No. 04–88–00057–CR.

Court of Appeals of Texas,
San Antonio.

March 31, 1989.

Jerry D. Conner, Patricia R. Saum, and Conner & Dryer, Houston, for appellant.

Ronald L. Sutton, Dist. Atty. Junction, for appellee.

Before BUTTS, PEEPLES and CARR, JJ.

## OPINION

BUTTS, Justice.

This is an appeal from a conviction for possession of phenylacetone and methylamine with intent to manufacture methamphetamine. The trial court found appellant guilty and assessed his punishment at ten years' imprisonment.

Appellant brings four points of error: first, he challenges the adverse ruling on his motion to suppress evidence; second, he questions probable cause for the warrantless arrest of appellant; third, he challenges the sufficiency of the evidence to support the conviction; and last, he argues that the judgment upholding the conviction for a first degree felony is void.

Department of Public Safety Officer Dennis Land testified at the pretrial suppression hearing that officers began investigation on and surveillance of rural property located a few miles from Junction in December 1984. Located on the land comprising over fifty acres was a cabin. Pictures of the cabin introduced in evidence show it to be a one-story frame building with boarded-up windows and an observation tower on top. There is no running water and no bathroom. The owner is Alan Gardner. Land testified that he surveilled the property on December 11, 1985, and saw a man outside the cabin. At that time he was on property of the adjoining land owner. He was directed by that per-son to a place where fifteen to twenty abandoned five-gallon ether cans were located on the Gardner ranch.[1] Although he could see the empty cans while on the adjoining property, he could not confirm what they were until he crossed the fence and went onto Gardner's land. *See Oliver v. United States*, 466 U.S. 170, 179, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) (unoccupied and undeveloped area is "open fields"). The Fourth Amendment does not have the same reach as extant trespass laws, for "the common law of trespass furthers a range of interests that have nothing to do with privacy and that would not be served by applying the stricture of trespass law to officers." *See* 1 LAFAVE, SEARCH AND SEIZURE, *Protected Areas* § 2.1(d) (2d Ed.1987). At that time Land smelled strong odors of the chemicals used in the manufacture of methamphetamine.

The evidence showed that Land together with another officer and an informant went to the property in December 1984. The informant, presumably a hunter, had been in the cabin and apparently reported it had been "abandoned." The informant had smelled strong chemical odors on the premises and went inside. He found what appeared to be a "clandestine methamphetamine lab." Land and the other officer went into the cabin where they smelled strong chemical odors they associated with the manufacture of methamphetamine. Land began a periodic surveillance of the property trying to get by the location on a weekly basis. It was not until December 1985 that officers observed activity on the property which indicated the manufacture of methamphetamine was occurring. The trial court, subsequent to the preliminary hearing, carried the motion to suppress through the trial and overruled it at the close of trial.

On December 7, 1985, Land, observing from a pump station on adjoining property, saw a man outside the cabin, lights in the cabin, and a vehicle parked outside. This was appellant, who stayed until the morning of the 12th. Once on Gardner's proper-

---

1. Ether is used in the manufacture of metham-  phetamine.

ty, and "downwind," Land detected the peculiar odors of the chemicals used in the manufacture of methamphetamine. He also saw and heard exhaust fans at the cabin. Appellant was inside the cabin. It was established that exhaust fans are used to rid the "lab" premises of strong and sometimes dangerous fumes.

In point of error one appellant attacks the validity of the search warrant in that the affidavit of officer Land did not contain allegations sufficient to constitute probable cause. Appellant argues the information in the affidavit was "stale"; the information does not show the surveillance disclosed criminal behavior; neither the credibility, reliability of the informant nor the basis of his knowledge is shown; the information discloses violation of the Fourth Amendment of the United States Constitution as well as the Texas Constitution (unreasonable search and seizure); and the affidavit contains false information.

■ In the present case the "standing issue" was argued before the trial court, which ruled that neither appellant nor his co-defendant, Frank Lawson Reed, had the requisite standing to move to suppress the evidence resulting from execution of the search warrant at the cabin. The Court's decision in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), makes it plain that the question of a defendant's reasonable expectation of privacy is an issue going to the merits of his Fourth Amendment claim. The defendant bears the burden of proving that he had a legitimate expectation of privacy in the premises searched. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). *See Wilson v. State,* 692 S.W.2d 661, 667 (Tex.Crim.App.1984). The evidence here showed that appellant and Reed burned some of the materials from the methamphetamine lab, buried others, and disposed of others before loading a white pickup (Gardner's) with phenylacetone and methylamine and other supplies and equipment. They abandoned any remaining items left in the cabin.

We find that appellant did not sustain his burden of showing a substantive Fourth Amendment and Texas Constitutional right to a legitimate expectation of privacy in the cabin and the surrounding land. Although appellant testified he had Gardner's permission to be there, we agree with the trial court that appellant did not have a reasonable and legitimate expectation of privacy in the premises at the time of the search and seizure, because he had clearly abandoned the premises with no intention of returning. *Villarreal v. State,* 708 S.W.2d 845, 849 (Tex.Crim.App.1986). Point of error one is overruled.

■ The evidence showed that appellant had been at the cabin about five days when Reed drove a brown pickup truck to the location, stopping at the bottom of a hill. From there a steep road led to the cabin. The weather was very cold and icy. Appellant and Reed loaded all the saved items into a white pickup (Gardner's) at the cabin. Observing them in these activities from early morning until their arrest later were several officers. One officer, Jesse Salazar, testified that he was a San Antonio city police officer with ten years experience who was assigned to the Drug Enforcement Administration. He participated in the surveillance "twelve to fifteen times." He located himself at the pump station early on the morning of December 12, 1988. At trial he testified that the odors were strong, pungent chemical odors identified with the manufacture of methamphetamine at clandestine laboratories. He saw two men burn certain products and later identified appellant and Reed by the clothing they wore. Salazar and officer Bywaters observed the early morning events together.

Officer Tommy Reyna testified that he had been a narcotics investigator with the Department of Public safety for seven years. He was part of the surveillance team, arriving back at the scene about 8:00 A.M. on the 12th. He and Trooper Delbert Roberts received radio communication to stop the Ford truck leaving the "lab site area." This was the white truck driven by appellant. Reyna drove the truck back to the cabin.

Land had secured a search warrant from the district judge in Brady and was driving to the scene that early morning when he was notified the subjects were leaving. The two men had loaded everything in the white pickup and transported it down the road to the brown pickup where the items were then divided between the two vehicles. Both trucks proceeded off the property. Land issued a radio order to stop them and arrest each one when they reached the highway. Both appellant and Reed were arrested. The trucks were taken to the cabin and searched and contraband recovered.

The question is whether there existed probable cause to arrest appellant without a warrant and seize the items in his pickup. There was evidence that officer Land had six years' experience as a narcotics officer with the Department of Public Safety, and before that he was a trooper (from 1973). He had attended law enforcement schools where he learned to detect and identify methamphetamine as to possession, manufacturing, and use. He stated he had seized methamphetamine in other cases. DEA Special Agent Steve Combs had been contacted first by the informant-hunter. Combs and Land were shown where the informant had placed items he took from the cabin. A subsequent analysis of these early retrieved items at the Texas Department of Public Safety laboratory disclosed traces of methamphetamine. On the December day in 1984 that Combs and Land went into the cabin they smelled a strong odor of chemicals which from their experience they associated with the manufacture of methamphetamine. Land was able to identify certain known individuals, later named in the search warrant, who were seen on the property at different times.

Land believed he saw Alan Gardner at the property on December 7, 1985, when the lights in the cabin stayed on all night. It was actually the appellant who was present. Land surveilled the property "periodically" from that date to December 11, 1985. It was at that time he saw the ether cans discarded about 75 yards from the rear property fence line. He then approached the cabin, heard the exhaust fans

running and again smelled strong chemical odors associated with the manufacture of methamphetamine. As set out in the affidavit, the informant had identified on the premises "an unknown quantity of ethyl ether contained in black cans, triple beam balance scales, oxygen pumping motor ring stand, sodium hydroxide, hot plates, electric chemical mixer, funnels, strainers, spatula, rubber surgeon tubing, universal bandage scissors and numerous ring clamps for a ring stand." It was shown that these items are known by officers and DPS chemists to be used in the manufacture of methamphetamine.

In *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) the Supreme Court abandoned the rigid two-prong test for determining whether an informant's tip establishes probable cause as delineated in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The appellate courts now examine the particular factual context and apply a "totality of the circumstances" standard. Texas has extended the application to warrantless arrests and searches. *See Eisenhauer v. State,* 678 S.W.2d 947 (Tex.Crim.App.1984).

Land and other officers smelled the familiar (to trained officers) odors of chemicals associated with the manufacture of methamphetamine on more than one occasion emanating from the cabin; items implemented in the manufacturing process had been recovered and identified; officers observed the burning and the destruction of some of the items used; and officers observed the loading of the pickup truck with the saved items. These observations and perceptions which occurred during the ongoing surveillance substantially corroborated by independent on-site investigation the informant's tip.

■ That some of the events giving rise to the search and seizure began one year earlier does not create "staleness," because *at the time* of the arrest there was a great likelihood of finding the contraband. If such past information and subsequent investigation contribute to an inference that probable cause exists *at the time* of the

arrest and discovery of the contraband, then the age of the information does not create a taint of staleness.

Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense had been or is being committed. *See Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *Woodward v. State,* 668 S.W.2d 337, 345 (Tex.Crim.App.1982). The experience and expertise of an officer may be taken into account in determining whether probable cause is present. *See* LAFAVE, 1 SEARCH AND SEIZURE, *Probable Cause* § 3.2(c) (2d ed. 1987). In the present case Land, Salazar and other officers identified lab equipment and supplies by sight. The officers also smelled distinctive and pungent chemical odors associated with this offense and were qualified to know the odor. *See, e.g., Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

■ At the time appellant and Reed were stopped and arrested, the officers had within their knowledge those matters previously delineated; they knew that materials and items from what they had concluded to be a "clandestine methamphetamine lab" had been loaded into the white pickup and that the two vehicles driven by the two men were leaving the area. Once the vehicles were stopped, strong odors of chemicals emanated from the boxes and packages in the pickups as well as from appellant and Reed themselves. Leaving aside the subject of the search warrant,[2] we find that these circumstances were more than sufficient to constitute probable cause to stop the vehicles, place the drivers under arrest, and search the vehicles for contraband. Although exigent circumstances did exist in this instance, it would not be necessary that exigent circumstances be present. The fact that a vehicle may be held at a police agency and could be held long enough to secure a warrant before conducting a search does not make the search [on the highway] unlawful or unreasonable. *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). *See Sanchez v. State,* 582 S.W. 2d 813, 815 (Tex.Crim.App.1979). Point of error two is overruled.

The third argument is that the evidence is insufficient to support the conviction. TEX.REV.CIV.STAT.ANN. art. 4476–15 (Vernon Supp.1989) provides in pertinent part:

Sec. 4.02(a) For the purpose of establishing criminal penalties for violation of this Act, there are established the following groups of controlled substances:

\* \* \* \* \* \*

(b) Penalty Group 1. Penalty Group 1 shall include the following controlled substances:

(7) Phenylacetone and methylamine, if possessed together with intent to manufacture methamphetamine;

\* \* \* \* \* \*

Sec. 4.03(a) Except as authorized by this Act, a person commits an offense if he knowingly or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 1.

In reviewing sufficiency of the evidence, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Flournoy v. State,* 668 S.W.2d 380, 383 (Tex.Crim.App.1984). " 'Possession' means actual care, custody, control or management." TEX.REV.CIV.STAT. ANN. art. 4476–15, § 1.02(36) (Vernon

---

**2.** The search warrant named persons other than appellant. It provided, however, for the arrest of "persons unknown to affiant who may be at the cabin." It was not necessary to name appellant in the search warrant. *Hodges v. State,* 604 S.W.2d 152, 154 (Tex.Crim.App.1980).

Supp.1989); *Humason v. State*, 728 S.W.2d 363, 365 (Tex.Crim.App.1987). The accused must know the matter possessed was contraband. *Sinor v. State*, 612 S.W.2d 591, 592 (Tex.Crim.App.1981). In addition, possession must be a voluntary act. TEX.PENAL CODE ANN. § 6.01(b) provides:

(b) Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control.

■ Furthermore, possession of the controlled substance need not be exclusive and evidence which shows the accused jointly possessed the controlled substance with another is sufficient. *Oaks v. State*, 642 S.W.2d 174, 176 (Tex.Crim.App.1982).

■ In the present case appellant was in the cabin for five days. A doctor of chemistry, he was there as a favor to Alan Gardner, to "clean up" the cabin. Appellant told Reed the "stuff" was not ready to be loaded when he drove from Round Rock. Reed drove again to the cabin the following night. Reed left his truck and drove the other one up the icy road. [A police car was later driven to the cabin by a back road because it was easier.] Although the cabin lacked conveniences such as water and bathroom facilities, and possibly heat, appellant stayed five days. The evidence stressed that the chemical odors in the cabin were so overpowering they could be detected 75 yards away.

Appellant told Reed, from the way the cabin smelled, he thought it was some kind of a lab set-up. Appellant said he was not ready to move the stuff out. Appellant said he thought it might be dangerous chemicals or something that could harm Reed. In spite of this warning Reed did stay the night of the 11th.

As soon as it was "light," the two began burning items and chemicals. They loaded everything they were going to remove and take with them into the white pickup. Then they transferred part of it to the brown pickup at the bottom of the hill. They were to deliver the loads to Gardner. Appellant was stopped and arrested as he drove onto the highway.

Appellant stated he was there merely to "clean it [the cabin] up." Pictures of the interior of the cabin clearly refute that the cabin was "cleaned up." Appellant and Reed were returned to the cabin, and the search warrant was executed then. Reed said he had been told by Gardner to give Crawford time to get ready for Reed to come to the cabin to haul off the stuff. What he was to "haul back" was scattered all over the cabin, "boxes and stuff." Reed smelled an "overpowering smell." And from what appellant "told me, that's what we was gonna be hauling back."

Appellant testified that he was a chemist with a doctorate degree and had taught at Texas A & M University. He and Gardner were friends. He said Gardner contacted him telling him he had gone to check on his "hunting cabin" utilities and "peered inside," seeing equipment and chemical "strewn about," and smelled a "very strong chemical odor coming from that place." Gardner went back home to Round Rock and called appellant, who agreed to go there and remove any "dangerous or illicit chemicals." He was given Gardner's white pickup to use. There was a lot of broken glass and equipment and materials in the cabin. Some of the items were five-gallon cans of ether, bottles of methylamine, and glassware. His "fee" would be the salvage of any chemicals and equipment that were "legal." His job was to clean up the cabin, he said. "I deduced this was probably a—a drug lab, and therefore, began to look for any substances which might be illicit." He said there was a bottle containing phenylacetone. He went into town and telephoned Gardner and was told someone with a truck would arrive to help. He left his pickup at the bottom of the hill, blocking the road to the cabin. He said he had not finished, was not ready with everything boxed up, when his co-defendant Reed arrived on the night of the 11th. Reed left after being told it would take another day or day and a half. Appellant said he prepared the phenylacetone he found for destruction by burning. He and Reed burned "all the garbage" at once on the morning of the 12th. He testi-

fied that they burned all the chemicals he suspected were illegal. They loaded materials into the white pickup and drove it down to the brown pickup at the bottom of the hill, where they transferred part of the load. They were to deliver the load to Gardner in Round Rock.

He stated that a "tee-tiny" amount of methamphetamine was found in his jacket pocket when he was searched after the arrest. However, he disclaimed ownership of the jacket and thus, the methamphetamine. He denied making any methamphetamine. Appellant said that the phenylacetone and methylamine by themselves do not produce methamphetamine. He stated you must have a reducing agent; the three ingredients then combine to make an oil (a free base). Next the oil is dissolved in ether, and then HcO gas is bubbled through it "until you produce no more powder." He said there was an HcO cylinder at the cabin.

He said the reason it took five days to clean up the cabin was that he was a slow worker, and he was not feeling well. He admitted he did not notify any law enforcement officials about the suspected illegal drug lab. He said he did not discuss that possibility with Gardner either.

Introduced into evidence was his "doodled" formula for a reaction mechanism of the step-by-step conversion of benzyl cyanide down to phenylacetic acid. This was for "practice" while at the cabin, he said.

The five gallon cans of ether which were recovered from the trucks were valued at about $500. The DPS chemist who was present in the cabin when it was searched indicated they were too volatile and too dangerous to transport back down the hill or anywhere and ordered the ether poured out. Appellant stated he had no idea they had any phenylacetone in the trucks. The jacket that he wore was introduced into evidence and the odor was still evident at the time of trial. He said he wore the jacket because the weather was cold and "by that time my nose was fairly well blocked out ... it doesn't stink very much."

Appellant denied making a statement to officer Jesse Salazar at the cabin about the temperature and the resulting inability to manufacture methamphetamine. Salazar was permitted for impeachment purposes to testify that appellant told him "the reason why he hadn't finished his product was because it slowed him down too much because the temperature was too cold."

The DPS chemist testified that the precursor chemicals for the manufacture of methamphetamine are phenylacetone and methylamine. She said that those chemicals in the amounts recovered from the two trucks had no other recognized use outside an industrial or academic setting. She identified the chemical equation of appellant's as a complicated formula beginning with benzyl cyanide and ending with phenylacetic acid. She said that phenylacetic acid is a precursor chemical for the manufacture of phenylacetone. A five-gallon can of benzyl cyanide, weighing about 28 pounds, which was removed from appellant's truck was identified by her. It is used, she said, for the manufacture of phenylacetic acid, the precursor for phenylacetone, which is the precursor for methamphetamine. She also testified that the chemicals used in the manufacture of phenylacetone are phenylacetic acid, sodium acetate and phenyl anhydride. She described the distinct and pungent odors of these chemicals and methylamine which could be smelled from a great distance. She stated that many of the chemicals recovered were ordered destroyed because they were "extremely flammable, and some of them could be carcinogens." Recovered from appellant's truck, among other materials, were containers of approximately 29 pounds of methylamine, 12 pounds of phenylacetic acid, 35 pounds of acetic anhydride, 17 pounds of methylamine, and 8 pounds of acetic anhydride. A small amount of methamphetamine was retrieved from the jacket worn by appellant.

Direct evidence directly demonstrates the ultimate fact to be proven, whereas circumstantial evidence is direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven. *Taylor v. State,* 684 S.W.2d 682, 684

(Tex.Crim.App.1984). Although appellant depends entirely upon circumstantial evidence cases, we perceive this more as a direct evidence case.

To show unlawful possession of contraband there must be proof of independent acts and circumstances which affirmatively link the accused to the contraband in such a manner that it can be concluded that he had knowledge of the contraband as well as management or control over it. *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex.Crim.App.1985).

Affirmative links shown in the present case as to appellant were: (1) Appellant drove Gardner's pickup carrying the ingredients to manufacture methamphetamine. He loaded the phenylacetone into the brown pickup. (2) His undoubted knowledge and expertise regarding the manufacture of methamphetamine was proved. (3) Appellant stayed at the recognized "clandestine lab" for five days. (4) All the materials and equipment necessary for the manufacture were present and under his control. The reason Reed left the first time, the trial court could conclude, was that appellant was "cooking" methamphetamine, and it was not yet ready. (5) Appellant told Salazar his "product" was not finished because of the cold weather. (6) At first light, the appellant and Reed burned and destroyed chemicals and items involved. (7) Appellant helped load both pickups. (8) Appellant drove his pickup alone with the volatile chemicals and other items used in the manufacture of methamphetamine. (9) Appellant had in his pocket methamphetamine, the finished product. (10) Appellant's clothing was permeated with the strong odor of the chemicals used. (11) The chemical formula of appellant's for a known precursor of another precursor of methamphetamine was recovered at the lab.

Sitting as the trier of fact, the trial judge is entitled to accept or reject any or all of the testimony adduced. *Wright v. State*, 603 S.W.2d 838, 840 (Tex.Crim.App.1980). Reconciliation of conflicts and contradictions in evidence is within the province of the factfinder, and such conflicts will not call for reversal if there is enough credible testimony to support the conviction. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex.Crim.App.1982).

The trial judge as the sole judge of the credibility of the witnesses was entitled to disbelieve appellant's version. *Wicker v. State*, 667 S.W.2d 137, 141 (Tex.Crim.App.1984).

The sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the prosecution's evidence or believe that the defense evidence "outweighs" the State's evidence. If there is evidence which establishes guilt beyond a reasonable doubt, and if the trier of fact believes the evidence, we are not in a position to reverse the judgment on sufficiency of the evidence grounds. *Wicker v. State*, 667 S.W.2d at 143.

The offense charged is a specific intent offense, i.e. "with intent to manufacture methamphetamine." A person acts with intent with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX.PENAL CODE ANN. § 6.02(a) (Vernon 1974). Intent can be inferred from the acts, words, and conduct of the accused. *Dues v. State*, 634 S.W.2d 304, 305 (Tex.Crim.App.1982). In this case the trial court could consider all the actions of appellant as set out before. In addition the conclusion may be reached that appellant was manufacturing, or attempting to manufacture methamphetamine, given the small confines of the cabin and the strong chemical odors emanating from it.

"In determining whether one has participated as a party ... reliance may be placed on actions of the parties which show an understanding and common design to do a certain act." *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex.Crim.App.1978); TEX.PENAL CODE ANN. §§ 7.01; 7.02 (Vernon 1974). We find the evidence shows a common design and understanding by appellant not only to aid and encourage the commission of the offense, but also direct participation by him. Viewing the evidence in the light most favorable to the prosecution,

we find the evidence is sufficient to support the conviction. The point is overruled.

In point of error four appellant argues that the judgment is void because the trial court erroneously assessed punishment for a first degree felony conviction. We do not agree.

TEX.REV.CIV.STAT.ANN. art. 4476–15 (Vernon Supp.1989) provides in part:

Sec. 4.02(a) For the purpose of establishing criminal penalties for violation of a provision of this Act, there are established the following groups of controlled substances:

(b) Penalty Group 1 shall include the following controlled substances:

\* \* \* \* \* \*

(7) Phenylacetone and methylamine, if possessed together with intent to manufacture methamphetamine.

\* \* \* \* \* \*

Sec. 4.03(a) Except as authorized by this Act, a person commits an offense if he knowingly, or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 1.

(b) An offense under subsection (a) of this section is a felony of the first degree if the amount of the controlled substance manufactured, delivered, or possessed with intent to manufacture or deliver is, by aggravate weight, including any adulterants or dilutants, less than 28 grams.

\* \* \* \* \* \*

Appellant's argument has been decided adversely to his position in *Hodges v. State*, 604 S.W.2d 152, 155–56 (Tex.Crim.App. 1980). The *Hodges* indictment was like the present indictment. The court stated that "[i]f the substance is possessed with the requisite intent to manufacture, an offense under § 4.03(a) is committed. If there is no such intent to manufacture, there is no offense." The *Hodges* conviction was set aside because the assessed punishment of four years "is less than the minimum of five years allowed by law." 604 S.W.2d at 156. This is the minimum punishment for a first degree felony. The point is overruled.

The judgment is affirmed.