**Angel Luis CUERO, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–91–00381–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 17, 1992.

Discretionary Review Refused
April 7, 1993.

388

Alan S. Percely, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Kimberly Aperauch Stelter, Ira Jones, Asst. Dist. Attys., Houston, for appellee.

Before DUGGAN, DUNN and O'CONNOR, JJ.

OPINION

DUGGAN, Justice.

Pursuant to a plea bargain agreement, appellant entered a plea of guilty to the offense of aggravated possession of cocaine. The trial court assessed punishment at 35 years confinement and a $100,000 fine, and granted appellant permission to appeal the overruling of his motion to suppress evidence.

In two points of error, appellant challenges, first, the validity of his initial temporary detention when he was stopped by officers while driving an automobile, and second, the voluntariness of his consent to their search of the automobile, which resulted in seizure of the cocaine. We affirm.

At a hearing on a motion to suppress, the trial court is the exclusive judge of the facts proved, the credibility of witnesses, and the weight to be given their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990). The trial court's findings concerning admissibility of evidence will not be disturbed absent a clear abuse of discretion. *Rivera v. State*, 808 S.W.2d 80, 96 (Tex.Crim.App.1991). In determining whether the trial court abused its discretion in denying a motion to suppress, the court of appeals must review the evidence adduced at the suppression hearing in the light most favorable to the trial court's finding, *Daniels v. State*, 718 S.W.2d 702, 704 (Tex.Crim.App.1986), and may not disturb any finding supported by the record. *Johnson v. State*, 803 S.W.2d 272, 287 (Tex.Crim.App.1990).

City of Houston Police Officer R.A. Hundersmarck, a five-year member of the narcotics task force, received information on September 14, 1990, from a reliable informant that some black Colombians, living at 10300 Wilcrest, apartment 1419, were involved in the sale and distribution of large quantities of cocaine. Three days later, while the Wilcrest location was under surveillance, a first-time informant told Hundersmarck that a black Colombian known as Luis Guerezzo had just received a large shipment of cocaine, that he would be moving it in the next week to 10 days, and that he drove a Suzuki Sidekick, license plate number 6293 VE.

Officer Hundersmarck began a surveillance of the Wilcrest apartment. The next day, he followed the occupants of that apartment to 12770 Rodeo Square, apartment 2411. There, he saw a Suzuki Sidekick in the parking lot and watched its driver, a black male, enter apartment 2411. A license check on the Suzuki revealed that it belonged to Luis Guerezzo. Hundersmarck ended his surveillance of the Wilcrest address and began surveillance on Guerezzo and his car. He followed Guerezzo first to Giro–Ya, an establishment known for wiring money to South America, and then to Latino No. 3 night club, a location known to be frequented by Colombians involved in cocaine trafficking. From there, Guerezzo made a "heat run," which Hundersmarck testified was a method of erratic driving by which the driver seeks to determine if he is being followed.

Officer Hundersmarck followed Guerezzo to 6819 Cook Road, the Pelican Landing Condominiums, a location surrounded by a fence, with a security gate and a guard. There, Hundersmarck saw Guerezzo enter apartment 1413. He then saw a man he had previously seen at the 10300 Wilcrest apartment, along with another male and female, carrying grocery bags into apartment 1413. Hundersmarck testified on cross-examination that grocery bags are often used to transport drugs.

Guerezzo left the Pelican Landing apartment, and Officer Hundersmarck followed him to the Celline Condominiums at 6303 Gulfton, where the surname "Guerezzo" appeared on the residence register. Hundersmarck ended his surveillance of Guerezzo for the night.

Hundersmarck returned the next morning and found Guerezzo's car still parked

at the Celline Condominiums. When Guerezzo left carrying a medium brown carrying pouch, Hundersmarck followed him again to Giro–Ya and on to the Pelican Landing Condominiums. From a service station near the condominium project, Hundersmarck saw a black male, whom he identified in the courtroom as appellant, carrying a large U–Haul box from the area of apartment 1413. Appellant, walking quickly and continually looking around, appeared quite nervous as he approached a white Buick. Hundersmarck moved closer, climbed over the fence surrounding the condominiums, and approached from behind as appellant placed the box in the Buick's trunk. He saw appellant look inside the box; however, when Hundersmarck came within 12 feet of appellant, appellant saw him, closed the box, and slammed the trunk shut. Hundersmarck suspected the box contained cocaine, but was not able to see its contents.

Appellant walked quickly up the sidewalk, glanced back at Officer Hundersmarck, stepped onto the landing for apartment 1504, stepped away, and was next seen by other surveillance officers in the area of apartment 1413. Officer Paoness told Hundersmarck that Guerezzo had left the complex. Paoness then saw two males help appellant jump start the Buick. Both officers followed appellant to the 4200 block of Cook Road. There, pursuant to Hundersmarck's direction, Sergeant John McClellan, a uniformed officer, turned on his marked vehicle's overhead lights, stopped appellant, and asked him to step out of his vehicle. Appellant got out.

Officer Hundersmarck arrived momentarily, and asked appellant if he could talk to him; appellant said yes. Hundersmarck testified that he asked appellant if he understood that he was free to go and was not under arrest, and appellant said yes. Hundersmarck asked him who owned the vehicle, referring to the Buick, and appellant replied, "It's not mine. It's my friend's." Hundersmarck then asked appellant if he would voluntarily consent to a search of the vehicle, and told him he had the right to refuse and to say no. Appellant responded, "No problem. You can

look." However, when Hundersmarck asked appellant to sign a consent form, written in Spanish, appellant refused. Hundersmarck again asked if he could search appellant's vehicle, and he said, "Yeah, no problem." Hundersmarck took the keys from the ignition, opened the trunk, and found a U–Haul box containing about 15 kilograms of cocaine. He then arrested appellant. Hundersmarck did not ask appellant if he could speak English; however, he said appellant appeared to understand English because he responded to his questions in English in a logical, sensible manner.

At trial, appellant testified through an interpreter that he did not understand English; that after McClellan stopped him and motioned him out of his car, he was handcuffed by an officer and placed in the back of the patrol car; and that Officer Hundersmarck never spoke to him or showed him a document in Spanish. Appellant called two witnesses who testified that he does not understand English.

In appellant's first point of error, he asserts that the trial court erred in overruling his motion to suppress evidence because he was arrested without warrant and without probable cause, and no exigent circumstances existed.

*The officer's presence in the condominium parking lot*

■ Appellant first argues that when Officer Hundersmarck climbed the security fence surrounding the Pelican Landing Condominiums, he trespassed onto the premises and therefore made an unlawful entry onto the condominium grounds where apartment 1413 was located. Thus, appellant contends, Hundersmarck's observations of him in the complex constituted an illegal search and cannot be used to determine the existence of either probable cause for an arrest or reasonable suspicion for an investigatory stop.

Appellant relies on decisions holding that *probable cause* cannot be established by evidence obtained during an unlawful entry upon property. *Gonzalez v. State*, 588 S.W.2d 355, 360 (Tex.Crim.App.1979); *Liv-*

*ingston v. State*, 731 S.W.2d 744, 747–48 (Tex.App.—Beaumont 1987, pet. ref'd); *Pope v. State*, 635 S.W.2d 815, 818 (Tex. App.—Dallas 1982, no pet.). He suggests, without case authority, that the same rule *"should* apply equally to establishing reasonable suspicion sufficient to justify an investigatory stop." (Emphasis added).

In the cases appellant cites, the searches and seizures struck down involved the activities of law enforcement officers who gained probable cause information by (1) trespassing into the curtilage of the defendant's dwelling, *Gonzalez*, 588 S.W.2d at 360; *Livingston*, 731 S.W.2d at 746; or (2) searching the defendant's entire dwelling after his arrest at the front door and departure in custody. *Pope*, 635 S.W.2d at 817.

In *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), law enforcement officials made a warrantless entry onto Dunn's ranch property and crossed over the perimeter fence, one interior fence, two barbed wire fences, and a wooden fence enclosing the barn in order to observe suspected illegal activity inside the barn. *Id.* at 297–98, 107 S.Ct. at 1137–38. The Supreme Court reversed the Fifth Circuit's reversal of Dunn's conviction and held that the area near a barn, located approximately 50 yards from a fence surrounding a ranch house, "lay outside the curtilage of the house," and accordingly was not protected by the fourth amendment. *Id.* at 296, 107 S.Ct. at 1137. The Court emphasized that "the Fourth Amendment protects the curtilage of a house, and that the extent of the curtilage is determined by the factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." The court identified "the central component of this inquiry as whether the area harbors the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Id.* at 300, 107 S.Ct. at 1139.

*Dunn* holds that curtilage questions should be resolved by addressing four factors: (1) the proximity, to the home, of the area claimed to be curtilage; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* at 301, 107 S.Ct. at 1139. Because the record is unclear as to whether appellant was a resident at the Pelican Landing Condominiums, and nothing indicates he claimed the parking lot to be curtilage, it is not necessary for us to address the specific factors as they relate to the instant case. In any event, TEX.PENAL CODE ANN. § 1.07(a)(29) (Vernon 1974) defines a "public place" as any place where a substantial group of the public has access, including, but not limited to, the common areas of apartment houses. In *Thibaut v. State*, 782 S.W.2d 307, 309 (Tex.App.—Eastland 1989, no pet.), the court held the parking lot of a multi-unit condominium complex, which was accessible to a substantial group of the public, to be a public place.

In our case, Officer Hundersmarck crossed over one exterior fence of a condominium complex to observe suspected illegal activity in the parking area of the complex. Even if we were to assume that Cuero lived in one of the condominiums, a common area parking lot available to owners and guests cannot be considered an "area which harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." If, as in *Dunn*, a barn and the area immediately surrounding it, which are enclosed by five fences, are held to lie outside the curtilage of a private ranch house, a common parking area of a condominium complex must also lie outside the curtilage of the condominiums.

*Expectation of privacy*

Independent from his curtilage, appellant would be protected by the fourth amendment if he possessed a reasonable expectation of privacy. *Dunn*, 480 U.S. at 303, 107 S.Ct. at 1140. In *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the United States Supreme Court expressly rejected the argument that the erection of fences in an open field creates a constitutionally protected

privacy interest. *Id.* at 182–83, 104 S.Ct. at 1743–44. In addition, the Court stated that "[a]n open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Id.* at 180 n. 11, 104 S.Ct. at 1742 n. 11. In following *Oliver*, the *Dunn* Court concluded:

> It follows that no constitutional violation occurred here when the officers crossed over respondent's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of the barn.... [T]he officers never entered the barn, nor did they enter any other structure on respondent's premises.

480 U.S. at 304, 107 S.Ct. at 1141. Similarly, in our case, Officer Hundersmarck crossed over the condominium complex's perimeter fence, but he never entered any structure—much less a structure belonging to appellant—at the complex.

■ Similarly, appellant's argument that Officer Hundersmarck was trespassing while making his observations do not apply in the instant case. The common law of trespass furthers a range of interests that have nothing to do with privacy and that would not be served by applying the strictures of trespass law to officers. *Crawford v. State*, 769 S.W.2d 331, 332 (Tex. App.—San Antonio 1989, pet. ref'd) (quoting 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE art. § 2.1(d) (2d ed. 1987)). Criminal laws against trespass are prophylactic: they protect against intruders who poach, steal livestock and crops, or vandalize property. The civil action of trespass serves the important function of authorizing an owner to defeat claims of prescription by asserting his own title. *Oliver*, 466 U.S. at 183 n. 15, 104 S.Ct. at 1744 n. 15.

Appellant neither conducted activities within the curtilage of his dwelling nor possessed a reasonable expectation of privacy while in the parking area. Thus, under the standards set forth in *Dunn* and *Oliver*, and applied in *Crawford*, no illegal search or seizure was conducted when Officer Hundersmarck based his "reasonable suspicion" on observations he made after climbing over the security fence that surrounded the condominium.

*The investigative detention*

■ Appellant next contends under his first point of error that even if Officer Hundersmarck lawfully observed him in the condominium complex, no reasonable suspicion was established sufficient to justify an investigative detention.

■ Circumstances short of probable cause may justify temporary detention for purposes of investigation. *Schwartz v. State*, 635 S.W.2d 545, 546 (Tex.Crim.App. [Panel Op.] 1982). To justify an investigative detention, the officer must have specific articulable facts which, premised upon his experience and personal knowledge, when coupled with the logical inferences from those facts would warrant the intrusion on the detainee. *Garza v. State*, 771 S.W.2d 549, 558 (Tex.Crim.App.1989). These facts must amount to more than a mere hunch or suspicion. *Williams v. State*, 621 S.W.2d 609, 612 (Tex.Crim.App. [Panel Op.] 1981). The articulable facts used by the officer must create some reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication the unusual activity is related to crime. *Meeks v. State*, 653 S.W.2d 6, 12 (Tex.Crim.App.1983); *Schwartz*, 635 S.W.2d at 547.

Here, Officer Hundersmarck possessed specific articulable facts that, coupled with his experience as a narcotics officer, justified appellant's temporary detention. Hundersmarck had information that the occupants of apartment 1419 at 10300 Wilcrest were involved in the sale and distribution of large quantities of cocaine. Another informant told him that Guerezzo had custody of a large amount of cocaine. This information became progressively corroborated: (1) when he saw the occupants of apartment 1419 and Guerezzo enter the same apartment; (2) when he followed Guerezzo to Giro–Ya, the money wire service to South America, and to Latino No. 3 night club, the locale known to be frequented by Colombian drug dealers; (3) when he observed Guerezzo make a "heat run"; and

(4) when he saw one of the occupants of apartment 1419 and two other individuals carry "grocery bags" into Guerezzo's apartment. The following day, Hundersmarck saw appellant leave the area of Guerezzo's apartment looking about furtively, carrying a large U–Haul box to the car. Appellant appeared nervous and, when he noticed Hundersmarck, he closed the box and slammed the trunk lid. These facts create reasonable suspicion that appellant's activity was out of the ordinary. Appellant's nervous and evasive behavior while preparing to transport the U–Haul box sufficiently related his activity to the crime. Therefore, Hundersmarck was justified in instructing Officer McClellan to stop appellant, and then in detaining him for questioning.

We overrule appellant's first point of error.

In appellant's second point of error, he contends that his consent to search was not voluntary and was in fact a direct product of his unlawful arrest and detention. Appellant contends that appellant did not understand English; thus, he did not voluntarily consent to the search of his car.

Searches conducted without a search warrant issued on probable cause are usually unreasonable. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1976). An exception is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Reyes v. State*, 741 S.W.2d 414, 430 (Tex.Crim. App.1987). The prosecution bears the burden of showing by clear and convincing evidence that any such consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Reyes*, 741 S.W.2d at 430. This burden requires the prosecution to show the consent was positive and unequivocal, free of duress or coercion. *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim.App.1985). Consent cannot be established by showing no more than acquiescence to a claim of lawful authority. *Juarez v. State*, 758 S.W.2d 772, 775 (Tex.Crim. App.1988). In the face of disputed testimony on the subject, as here, the question of voluntariness of the consent is a question of fact to be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047; *Reyes*, 741 S.W.2d at 430.

Officer Hundersmarck testified that he asked appellant if he understood that he was not under arrest and that he was free to go; that he informed appellant that he did not have to consent to a search of his vehicle; and that appellant gave no indication that he did not understand his right to leave or to say no to a search of his car.

The trial judge is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and as such, may believe or disbelieve all or any part of any witness' testimony. *Hawkins v. State*, 660 S.W.2d 65, 72 (Tex.Crim.App. 1983); *Snow v. State*, 721 S.W.2d 943, 946 (Tex.App.—Houston [1st Dist.] 1986, no pet.). Furthermore, the trial court is the sole trier of fact at a hearing on a motion to suppress, and this Court is not at liberty to disturb any finding that is supported by the record. *Green v. State*, 615 S.W.2d 700, 707 (Tex.Crim.App. [Panel Op.] 1980), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). Based on the totality of the circumstances, the evidence is sufficient to support the trial court's finding that appellant freely and voluntarily consented to the search of his vehicle. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047; *Reyes*, 741 S.W.2d at 430.

We overrule appellant's second point of error.

The judgment is affirmed.