THE STATE OF NEVADA, Appellant, *v.* THOMAS JACOB HARNISCH, Respondent.

No. 27347

January 30, 1997 931 P.2d 1359

---

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Appellant.

*Kirk Kennedy,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

On September 12, 1994, respondent Thomas Harnisch and an accomplice allegedly kidnapped Stephanie Prather and stole from her, among other things, several uncashed sports betting tickets. The two men cashed Prather's sports betting tickets and kept the money for themselves. Fingerprint analysis of those betting tickets led the police to Harnisch. Police obtained and executed a warrant to search Harnisch's apartment. While police were conducting the search, Harnisch arrived at the apartment and parked his car in his designated space; the police then searched Harnisch's car and discovered in the trunk of the car a telephone book with the names and addresses of the other suspects in the kidnapping and robbery of Prather. Harnisch filed a motion to suppress the evidence found in the trunk on grounds that the search warrant did not extend to a search of his car and that no exception to the warrant requirement existed to permit the search of the car. The district judge granted the motion to suppress and the State filed this appeal.

We conclude that the district court properly decided that the search of Harnisch's car was illegal and suppressed the evidence found in the car.

*FACTS*

On September 12, 1994, at approximately 10:45 a.m., Prather drove her brown Oldsmobile Cutlass into the Tropicana parking lot and parked. Prather was going to the MGM Hotel, which was across the street, to place a bet on a sporting event. The parking lot was monitored by video, and the videotape showed that at 10:55 a.m., a brown Chevrolet Caprice with a driver and a passenger pulled right next to Prather's car and the passenger got out of the car. Larry Rose, a Las Vegas police officer, testified that the passenger appeared to be using a "slim jim," a device used to open a locked car door, on Prather's driver's side door.[1] Rose also stated that the driver of the car, who was wearing a horizontally striped shirt, appeared to be Harnisch. Harnisch eventually did get out of the Chevrolet Caprice and acted as a lookout while the passenger attempted to open Prather's door.

Prather testified that when she returned to her car at approximately 12:00 p.m. and entered the driver's side of her car, the man with the horizontally striped shirt, presumably Harnisch, opened the passenger side door, stuck a gun into the car and pointed it at her, and said "Move over, he's driving." At that time, the other man, who had been the passenger trying to pry open Prather's door, appeared at the driver's side door and forced Prather into the middle of the seat. Harnisch then told Prather to put her head down, take off her purse, and put all of her belongings on the floor. Prather had $650.00 in cash, as well as five uncashed winning sports betting tickets from the Vacation Village Hotel worth $812.50. Prather also had four sports betting tickets that she had just purchased from the MGM Hotel and two sports betting tickets that she had earlier purchased at the Excalibur Hotel.

The two men and Prather drove in her car for a short while, and then the driver stopped the car at an apartment complex and told Prather to get out of the car. The men drove off in Prather's car, and Prather contacted the police. At approximately 1:00 p.m., within an hour of the robbery, the police contacted the Vacation Village Hotel and discovered that Prather's sports betting tickets had been cashed. Prather went to the Vacation Village Hotel with police officers, viewed surveillance videotape of several parts of the casino, and identified Harnisch on the videotape. Several days after the crime, Harnisch also attempted to cash the sports betting tickets from the Excalibur Hotel; but because the supervisor of the Excalibur sports book had placed a "lock" on the ticket, meaning that the hotel would not pay the wager if it was a winner, Harnisch was not paid.

---

[1] All of the testimony referred to occurred either at the preliminary hearing or the hearing on the motion to suppress.

Police recovered the Vacation Village Hotel and the Excalibur Hotel sports betting tickets, and found that Harnisch's fingerprints were on some of the tickets. Detective Rose was informed of this fingerprint information, and then went to Harnisch's apartment. Rose first checked the area for a car matching the one seen in the Tropicana videotape (a brown Chevrolet Caprice), and he eventually found such a car. Based on the fingerprint information and on seeing the matching car, Rose obtained a search warrant for Harnisch's apartment. The warrant stated that the police were looking for a horizontally striped pullover shirt, sports book betting tickets, and any identification or documentation in the name of Stephanie Prather. The warrant stated that these items were presently located at:

> 6530 Annie Oakley, Apartment No. 2114, Henderson, Clark County, Nevada, more particularly described as that certain apartment unit contained within the apartment complex at 6530 Annie Oakley, and marked as No. 2114.

Rose executed the search warrant on September 30, 1994. Rose and other officers entered the apartment and found a horizontally striped pullover shirt that matched the one in the videotape. As Rose was conducting the search, Harnisch arrived at the apartment and parked his car in his designated space. The police then took Harnisch into custody and read him the *Miranda* warnings while the search of his apartment was still in progress. After the search of the apartment had been concluded, Rose or another officer searched Harnisch's vehicle, including the trunk. In the trunk was a suitcase which contained a telephone book with the names and addresses of other individuals who later became suspects in Prather's robbery/kidnapping.

On July 20, 1995, Harnisch filed a motion to suppress the evidence retrieved from his car. He alleged that the search warrant was limited to a search of his apartment and did not encompass the car, and that no exceptions to the search warrant requirement were present. The State argued that the car was included within the ambit of the search warrant because the car was within the "curtilage" of Harnisch's apartment. The district judge ruled in favor of Harnisch and suppressed the evidence. The State now appeals the district judge's decision.

## DISCUSSION

*The district court did not err in granting respondent's motion to suppress evidence*

The State argues that the district judge improperly suppressed the evidence found in the trunk of Harnisch's car because the car

was located within the curtilage of Harnisch's apartment and was, therefore, covered by the search warrant. We disagree.

When considering a motion to suppress evidence pursuant to the Fourth Amendment, "[i]ssues concerning exigent circumstances, consent, and whether an individual is acting as an agent for the police present mixed questions of law and fact." State v. Miller, 110 Nev. 690, 694, 877 P.2d 1044, 1047 (1994). However, a district court's determination of whether an area is within the protected curtilage of the home presents solely a question of fact. See U.S. v. Traynor, 990 F.2d 1153, 1156-57 (9th Cir. 1993) ("[A] district court's determination whether an area is within the protected curtilage of the home 'should be classified as one of fact.' ") (quoting United States v. McConney, 728 F.2d 1195, 1202 (9th Cir. 1984)). "[F]indings of fact in a suppression hearing will not be disturbed on appeal if supported by substantial evidence." Miller, 110 Nev. at 694, 877 P.2d at 1047. Therefore, the district court's findings will be upheld unless this court is " 'left with the definite and firm conviction that a mistake has been committed.' " Traynor, 990 F.2d at 1157 (quoting United States v. Gypsum Co., 333 U.S. 364, 395 (1948)).

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection also extends to the curtilage of a house. United States v. Dunn, 480 U.S. 294, 300 (1987); Oliver v. United States, 466 U.S. 170, 180 (1984). It is an established rule that "[a] search warrant authorizing a search of a certain premises generally includes any vehicles located within its curtilage if the objects of the search might be located therein." U.S. v. Gottschalk, 915 F.2d 1459, 1461 (10th Cir. 1990); see also U.S. v. Griffin, 827 F.2d 1108 (7th Cir. 1987), cert. denied, 485 U.S. 909 (1988); United States v. Asselin, 775 F.2d 445 (1st Cir. 1985); United States v. Bulgatz, 693 F.2d 728 (8th Cir. 1982), cert. denied, 459 U.S. 1210 (1983); United States v. Napoli, 530 F.2d 1198 (5th Cir.), cert. denied, 429 U.S. 920 (1976). Therefore, the important determination is whether Harnisch's car was within the curtilage of his apartment while it was parked in his assigned parking space at his apartment complex.

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself." Dunn, 480 U.S. at 300. "[T]he Fourth Amendment protects the curtilage of a house and . . . the extent of the curtilage is determined by factors that bear upon whether an

individual reasonably may expect that the area in question should be treated as the home itself." *Id.* In *Dunn,* the Court stated:

> [W]e believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301. The Court also stated that analysis pursuant to these four factors will not provide a definitive answer to all "extent-of-curtilage" questions, but will be useful in the analysis of the centrally relevant consideration, which is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* Applying these factors to Harnisch's parking space, we have little difficulty in concluding that Harnisch's parking space (and his car parked in that space) lay outside the curtilage of his house and, therefore, was not covered by the search warrant.

First, while no testimony was given regarding how far away from the apartment the parking space was located, Harnisch's motion to suppress stated that the parking area was totally separate and distinct from the apartment units and was not connected to the apartment unit. Therefore, the parking space was not in direct proximity to the apartment unit and was not "an adjunct of the house." *Dunn,* 480 U.S. at 302.

Second, given Harnisch's description of the parking area, we conclude that it was not included within an enclosure surrounding the apartment unit. The United States Supreme Court has noted that "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience."[2] *Oliver,* 466 U.S. at 182 n.12. Applying *Oliver,* an apartment has little, if any, curtilage because an apartment unit is generally not enclosed by a fence or other boundary,[3] and this parking area

---

[2]We are cognizant of the fact that while "the boundaries of the curtilage are clearly marked for most homes, the analysis becomes more complicated when the residence is an apartment in a multi-family dwelling in an urban area." Espinoza v. State, 454 S.E.2d 765, 768 (Ga. 1995) (citations omitted).

[3]In Commonwealth v. Thomas, 267 N.E.2d 489 (Mass. 1971), the Massachusetts Supreme Court stated:

separated from the apartment unit itself appears to be outside of the clearly marked boundaries of the curtilage.

Third, because Harnisch only parked his car in the designated parking space and the space was apparently open to the public view, the parking space was not being used for "intimate activities of the home" or the "privacies of domestic life." *Dunn,* 480 U.S. at 302-03; *see* Cuero v. State, 845 S.W.2d 387, 391 (Tex. Ct. App. 1992) (stating that "a common area parking lot available to owners and guests cannot be considered an 'area which harbors the intimate activity associated with the sanctity of a man's home and the privacies of life' '').

Fourth, based on the testimony given, it appears that Harnisch did little or nothing to protect the parking space from the observation of those walking past the space. No testimony was given regarding what the area surrounding the parking space looked like; however, the police could see Harnisch approaching and parking in the parking space so we conclude that the parking space was in plain view of the general public.

Based on this analysis, we conclude that the parking space in question was not so intimately tied to the apartment itself that it should be placed under the apartment's "umbrella" of Fourth Amendment protection. United States v. Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976) (concluding that the appellant's well-travelled underground parking garage at his apartment complex was not part of the "curtilage" of his apartment unit because the appellant could not possibly have had an expectation of privacy in that area); *see* U.S. v. Walker, 922 F. Supp. 732 (N.D.N.Y. 1996) (concluding that a driveway, which was a common area open to the public, was not within the curtilage of the defendant's apartment unit because the defendant did not possess a legitimate expectation of privacy in that area).

Because we have concluded that the parking space was not within the "curtilage" of Harnisch's apartment unit, we must determine whether the police needed a warrant to search

---

In a modern urban multi-family apartment house, the area within the "curtilage" is necessarily much more limited than in the case of a rural dwelling subject to one owner's control. In such an apartment house, a tenant's "dwelling" cannot reasonably be said to extend beyond his own apartment and perhaps any separate areas subject to his exclusive control.

*Id.* at 491 (citations omitted) (concluding that an area in an apartment complex used for washing clothes was a common area not under the appellant's control, and therefore the area was not part of the "curtilage" of the appellant's apartment unit). We agree with the *Thomas* decision that separate areas under the exclusive control of the tenant may be considered part of the tenant's curtilage, but conclude that the parking area at issue in the instant case was not subject to Harnisch's exclusive control.

Harnisch's car; and if they did need a warrant but did not have one, whether any exceptions to the warrant requirement existed which permitted the police to search Harnisch's trunk.[4] We conclude that the police needed a warrant to search Harnisch's car and did not have one, and furthermore that no exceptions to the warrant requirements existed which permitted the warrantless search.

The police need a warrant to search a place where a person has a reasonable expectation of privacy. Katz v. United States, 389 U.S. 347, 360-61 (1967) (Harlan, J. concurring). Harnisch had a reasonable expectation of privacy in the contents in the trunk of his car because the trunk was closed and locked. Therefore, the search of Harnisch's trunk violated the Fourth Amendment unless an exception to the warrant requirement existed.

Initially, we note that the "plain view" exception does not apply because the contents of the trunk were not in plain view because the trunk was closed and locked. Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971). Additionally, there was no compelling need for official action, i.e., "exigent circumstances," which would have authorized a warrantless search because there was no emergency and Harnisch was apparently in police custody at the time the search was conducted. Michigan v. Tyler, 436 U.S. 499, 509 (1978); see Warden v. Hayden, 387 U.S. 294 (1967) (holding a warrantless entry of a house by police in hot pursuit of armed robber constitutional); Ker v. California, 374 U.S. 23 (1963) (holding a warrantless entry of a house by police to prevent imminent destruction of evidence constitutional); Doleman v. State, 107 Nev. 409, 812 P.2d 1287 (1991) (holding that where police entered into a hotel room to prevent possible danger as a result of defendant still being in possession of a gun, such warrantless entry was constitutional). Furthermore, the evidence at issue was not "evanescent evidence," i.e., likely to disappear before a warrant could be obtained. Schmerber v. California, 384 U.S. 757, 770-71 (1966).

Additionally, the "automobile exception" to the warrant requirement does not apply in this case. For the automobile exception to apply, two conditions must be present: first, there

---

[4]In this appeal, the State only raised the curtilage issue and did not raise the warrant exception issue. However, we may consider constitutional issues *sua sponte*. McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983).

must be probable cause to believe that criminal evidence was located in the vehicle; and second, there must be exigent circumstances sufficient to dispense with the need for a warrant. Carroll v. United States, 267 U.S. 132, 153-54 (1925). In the instant case, the first factor may have been satisfied but the second, as stated above, was not; the opportunity to search the car was not "fleeting" because the car was not readily movable by the defendant. *See* Chambers v. Maroney, 399 U.S. 42, 51-52 (1970).

Finally, assuming that the "search incident to arrest" exception to the warrant requirement, which extends to vehicle searches when the driver is subjected to custodial arrest, applies here, it did not provide a constitutional basis for the search. New York v. Belton, 453 U.S. 454, 457 (1981). A search incident to an arrest is limited to the passenger compartment of the vehicle and does not extend to the trunk. *Belton,* 453 U.S. at 460. Because the police searched Harnisch's trunk, this was not a valid search incident to arrest. Furthermore, a search incident to arrest derives from the need to disarm and prevent any evidence from being concealed or destroyed. State v. Greenwald, 109 Nev. 808, 810, 858 P.2d 36, 37 (1993) (citing Chimel v. California, 395 U.S. 752 (1969)). Because Harnisch was in custody at the time of the search of the car, there was no "need" to disarm him or prevent him from concealing or destroying evidence. *Id.*

## CONCLUSION

Harnisch's parking space was not part of the curtilage of his apartment unit and therefore was not covered by the search warrant. Therefore, the police needed a warrant to search Harnisch's car, but they did not have one, and no exceptions to the warrant requirement applied. For these reasons, we affirm the district court's order suppressing the evidence found in Harnisch's trunk.[5]

---

[5]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this matter.