# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP857-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent, |
| |    v. |
| | Brett W. Dumstrey, |
| |         Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 359 Wis. 2d 624, 859 N.W.2d 138)
(Ct. App. 2014 – Published)
PDC No: 2014 WI App 5

| | |
|---|---|
| OPINION FILED: | January 15, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 8, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Waukesha |
|   JUDGE: | Donald J. Hassin, Jr. |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | PROSSER, GABLEMAN, J.J., concur. (Opinion Filed) |
|   DISSENTED: | A.W. BRADLEY, ABRAHAMSON, J.J., dissent. (Opinion Filed) |
|   NOT PARTICIPATING: | R.G. Bradley, J., did not participate. |

ATTORNEYS:

For the defendant-appellant-petition, there were briefs by *Anthony B. Cotton* and *Jeffrey J. Szczewski,* and *Kuchler & Cotton, S.C.,* Waukesha, and oral argument by *Anthony B. Cotton.*


For the plaintiff-respondent, the cause was argued by *David H. Perlman,* assistant attorney general, with whom on the brief was *Brad D. Schimel,* attorney general.

**2016 WI 3**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP857-CR
(L.C. No. 2012CT508)

STATE OF WISCONSIN      :      IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

      **v.**

**Brett W. Dumstrey,**

      **Defendant-Appellant-Petitioner.**

**FILED**

**JAN 15, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. We review a published decision of the court of appeals,[1] which affirmed the Waukesha County Circuit Court's[2] denial of defendant Brett Dumstrey's (Dumstrey) motion to suppress evidence acquired after a stop and subsequent arrest. Dumstrey's motion challenged the legality of the stop and subsequent arrest on Fourth Amendment grounds.

---

[1] *State v. Dumstrey*, 2015 WI App 5, 359 Wis. 2d 624, 859 N.W.2d 138.

[2] The Honorable Donald J. Hassin, Jr. of Waukesha County presided.

¶2    After being followed by police for erratic driving, Dumstrey drove inside of the parking garage underneath his apartment building, where he was stopped by police and subsequently arrested for operating while intoxicated (OWI), contrary to Wis. Stat. § 346.63(1)(a) (2013-14).[3] Dumstrey does not challenge the fact that police had reasonable suspicion to stop him.    However, he argues that the officers' conduct violated the Fourth Amendment's prohibition against unreasonable searches and seizures because it occurred during a warrantless entry into a constitutionally protected area, curtilage of his home.

¶3    Therefore, the central question before us is whether the parking garage underneath the apartment building constitutes curtilage of Dumstrey's home such that it is protected by the Fourth Amendment.    We also consider whether Dumstrey has shown a reasonable expectation of privacy in the parking garage, thereby warranting Fourth Amendment protections.

¶4    We conclude that the parking garage underneath this apartment building does not constitute curtilage of Dumstrey's home.    We further conclude that Dumstrey has shown no reasonable expectation of privacy in the garage.    Consequently, Dumstrey's stop and subsequent arrest in the garage did not violate the Fourth Amendment's prohibition against unreasonable seizures. Stated otherwise, the seizure did not occur after a warrantless

---

[3] All further references to the Wisconsin Statutes are to the 2013-14 version, unless otherwise indicated.

entry into a constitutionally protected area. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶5 On the night of Friday, April 20, 2012, Officer DeJarlais, of the City of Waukesha Police Department, was off duty and was wearing plain clothes while operating his unmarked, personal vehicle. At approximately 10:30 p.m., Officer DeJarlais observed a vehicle, later determined to be driven by Dumstrey, pass him at a high rate of speed and then begin tailgating another vehicle. Officer DeJarlais subsequently passed both of these vehicles, at which point Dumstrey accelerated and began tailgating Officer DeJarlais. Dumstrey continued speeding and changing lanes, and at one point, he was straddling both lanes.

¶6 After watching Dumstrey's vehicle for some time, Officer DeJarlais called the police department dispatcher and requested a squad response to a possible intoxicated driver. Around that same time, Officer DeJarlais pulled up next to Dumstrey at a red light, rolled down his window, and made eye contact with him. Dumstrey likewise rolled down his window, at which point Officer DeJarlais displayed his police badge and photo identification card. Officer DeJarlais pointed out Dumstrey's erratic driving and instructed him to pull over and wait because the police were coming. Dumstrey stared back at him with a "blank look" and "appeared to be very intoxicated." His eyes were "sleepy looking" and "kind of glassy." After the light turned green, Dumstrey continued to sit at the

3

intersection. When the light turned yellow, he proceeded to drive through the intersection.

¶7 After driving through the intersection, Dumstrey stopped in the middle of the traffic lane, and Officer DeJarlais again pulled up next to him and told him to wait for the police. Dumstrey continued to stare at Officer DeJarlais and then drove off toward his apartment complex, consisting of five or six apartment buildings. Officer DeJarlais followed Dumstrey to a parking lot outside one of the apartment buildings where Dumstrey continued to drive around, as though "trying to lose" the officer. Subsequently, Dumstrey turned toward the parking garage underneath his apartment building, raised the garage door with his remote controlled opener, and "drove down beneath the apartment building into the parking garage."

¶8 Officer DeJarlais followed Dumstrey and parked his personal vehicle underneath the garage door so that the door would not come down and lock out the police response that he had requested. Officer DeJarlais then exited his vehicle and walked into the parking garage, toward where Dumstrey had parked in his assigned parking place. As Officer DeJarlais started approaching Dumstrey's vehicle, Dumstrey exited the vehicle and the two made contact. Officer DeJarlais instructed Dumstrey to stay put because the police were coming. He also displayed his police badge and photo identification, to which Dumstrey indicated disbelief that Officer DeJarlais was actually a police officer. Upon showing his badge and identification again, Dumstrey finally stopped and appeared to believe Officer

4

DeJarlais. Shortly thereafter, the responding officer, Officer Lichucki, arrived on the scene.

¶9 Officer Lichucki entered the parking garage through the garage door under which Officer DeJarlais had parked his vehicle. Officer Lichucki immediately made contact with Dumstrey and began asking him investigative questions. Dumstrey stated that he had driven home from a Milwaukee Brewers baseball game at Miller Park and denied having consumed any alcohol. Upon his questioning, Officer Lichucki observed that Dumstrey was swaying back and forth and his "eyes were glassy and somewhat bloodshot." His speech was also "slurred," and Officer Lichucki could smell "an odor of intoxicants coming from his person." Officer Lichucki requested that Dumstrey submit to various field sobriety tests, all of which he refused to perform. At that point, Officer Lichucki arrested Dumstrey for OWI. Later, Dumstrey consented to an evidentiary blood test, which revealed that his blood alcohol level was .178.

¶10 Dumstrey moved to suppress, challenging the legality of the stop and subsequent arrest on the basis that his seizure occurred after a warrantless entry, in violation of the Fourth Amendment. At the hearing, testimony established that Dumstrey lives in the apartment building under which the parking garage is located. Approximately 30 tenants live in Dumstrey's apartment building, and the parking garage has approximately 30 parking places. The residents, including Dumstrey, pay for their assigned parking places in the garage and use the garage only for parking rather than for storage or other uses.

5

Dumstrey testified that he can enter the parking garage only through the remote controlled garage door or through a locked door on the inside of the apartment building. All of the other tenants have access to the parking garage through these same means. In order to get from the parking garage to his home, Dumstrey uses the building's elevator. This elevator is likewise utilized by all other tenants.

¶11 The circuit court ultimately denied Dumstrey's motion, and he pled guilty to OWI, second offense, in violation of Wis. Stat. § 346.63(1)(a). The court of appeals affirmed, holding that there was no Fourth Amendment violation because the parking garage underneath the apartment building did not constitute curtilage of Dumstrey's home, and he did not have a reasonable expectation of privacy in the parking garage.[4] State v. Dumstrey, 2015 WI App 5, ¶14, 359 Wis. 2d 624, 859 N.W.2d 138. We granted Dumstrey's petition for review.

## II. STANDARD OF REVIEW

¶12 "[A] curtilage determination presents an issue of constitutional fact," State v. Martwick, 2000 WI 5, ¶16, 231 Wis. 2d 801, 604 N.W.2d 552, as does the general question of "whether police conduct violated the constitutional guarantee against unreasonable searches and seizures," State v. Griffith, 2000 WI 72, ¶23, 236 Wis. 2d 48, 613 N.W.2d 72. Questions of

---

[4] One judge dissented, indicating that he would hold that the parking garage constituted both curtilage and an area protected by a reasonable expectation of privacy. Dumstrey, 359 Wis. 2d 624, ¶18.

6

constitutional fact are subject to a two-step standard of review.  Id.

¶13  We uphold a circuit court's findings of historic fact unless they are clearly erroneous.  State v. Fonte, 2005 WI 77, ¶11, 281 Wis. 2d 654, 698 N.W.2d 594.  A finding is clearly erroneous if "it is against the great weight and clear preponderance of the evidence."  State v. Sykes, 2005 WI 48, ¶21 n.7, 279 Wis. 2d 742, 695 N.W.2d 277 (internal quotation marks omitted) (quoting State v. Tomlinson, 2002 WI 91, ¶36, 254 Wis. 2d 502, 648 N.W.2d 367).  We then "apply the constitutional principles to the facts at hand to answer the question of law." Martwick, 231 Wis. 2d 801, ¶23.

### III.  DISCUSSION

¶14  The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Article 1, Section 11 of the Wisconsin Constitution contains a substantively identical provision that we have historically interpreted in accord with the Supreme Court's interpretation of the Fourth Amendment.  State v. Arias, 2008 WI 84, ¶20, 311 Wis. 2d 358, 752 N.W.2d 748.

¶15  "Although our legal lexicon often presents 'searches and seizures' as an inseparable tandem, the two are

7

constitutionally and analytically distinct." Id., ¶25. Therefore, we first determine whether Dumstrey underwent a search or seizure for purposes of our Fourth Amendment analysis.

## A.  Search and Seizure

¶16 Searches affect privacy interests, such as bodily integrity and invasion of those places that a person has reserved for his or her individual use. See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Seizures, on the other hand, affect personal liberty interests such as the freedom of movement and the possession of one's property. See Delaware v. Prouse, 440 U.S. 648, 657 (1979).

¶17 We have recognized two types of seizure. State v. Young, 2006 WI 98, ¶20, 294 Wis. 2d 1, 717 N.W.2d 729. First, we have recognized the investigatory stop pursuant to Terry v. Ohio, 392 U.S. 1 (1968). Under Terry, a police officer may, under certain circumstances, temporarily detain a person for purposes of investigating possible criminal behavior even though there is not probable cause to make an arrest. Id. at 22. Such an investigatory stop must be preceded by the officer's reasonable suspicion that a crime has occurred, or is about to occur. Id. at 21; State v. Houghton, 2015 WI 79, ¶30, 364 Wis. 2d 234, 868 N.W.2d 143. Second, an arrest is a seizure. State v. Ferguson, 2009 WI 50, ¶17, 317 Wis. 2d 586, 767 N.W.2d 187. Generally, if the police have probable cause to make an arrest, they may not need a warrant. United States v. Watson, 423 U.S. 411, 417-23 (1976).

¶18 Officer DeJarlais followed Dumstrey into the parking garage in order to effectuate an investigatory stop as to whether he was operating while intoxicated. Once inside the garage, Officer DeJarlais stopped Dumstrey after he had exited his vehicle, displaying his police badge and identification. Dumstrey does not challenge whether Officer DeJarlais had reasonable suspicion to stop him; therefore, we assume, without deciding, that reasonable suspicion for the investigatory stop existed. Once Officer DeJarlais stopped Dumstrey with reasonable suspicion, Officer Lichucki questioned Dumstrey and observed his physical characteristics, including his swaying, slurred speech, glassy and bloodshot eyes, and the odor of intoxicants emanating from his person. Dumstrey similarly does not challenge whether these observations gave rise to probable cause for his arrest; therefore, we likewise assume, without deciding, that probable cause existed. Accordingly, we conclude that Dumstrey was seized in the parking garage when he was stopped and subsequently arrested for operating while intoxicated.

¶19 We further conclude that Dumstrey was not subjected to a search while stopped in the parking garage. Visual observation in the context of a lawful stop "does not constitute an independent search because it produces 'no additional invasion of [the suspect's] privacy interest.'" State v. Angiolo, 186 Wis. 2d 488, 497, 520 N.W.2d 923 (Ct. App. 1994) (alteration in original) (quoting Arizona v. Hicks, 480 U.S. 321, 325 (1987)); see also United States v. Jones, __ U.S. __,

9

132 S. Ct. 945, 953 (2012) (acknowledging that "mere visual observation does not constitute a search").

¶20 As set forth above, after Dumstrey was stopped, Officer Lichucki arrested him based on observations of his physical characteristics without further invading his bodily integrity. Therefore, aside from the stop and arrest, there was no additional invasion of Dumstrey's privacy interest. Consequently, the officers effectuated a seizure of Dumstrey, but no independent search occurred at that time.[5]

¶21 We now consider whether Dumstrey's seizure occurred within a constitutionally protected area, thereby constituting a warrantless entry in violation of the Fourth Amendment.

## B. Garage Entry

¶22 "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). "Indeed, '[i]t is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" State v. Richter, 2000 WI 58, ¶28, 235 Wis. 2d 524, 612 N.W.2d 29 (alteration in original) (internal quotation marks omitted) (quoting Welsh v. Wisconsin,

---

[5] However, after Dumstrey was arrested, a search occurred when he consented to the blood draw at the hospital. As Dumstrey does not challenge the blood draw on McNeely grounds, we need not address it. Missouri v. McNeely, __ U.S. __, 133 S. Ct. 1552 (2013) (discussing Fourth Amendment protections from nonconsensual, warrantless blood draw).

466 U.S. 740, 748 (1984)). Given this heightened Fourth Amendment protection, where police effectuate a warrantless arrest inside of a home, the State must prove that the warrantless entry was justified by exigent circumstances. Ferguson, 317 Wis. 2d 586, ¶¶19-20.

¶23 "The protection provided by the Fourth Amendment to a home also extends to the curtilage of a residence." Martwick, 231 Wis. 2d 801, ¶26; State v. Walker, 154 Wis. 2d 158, 183, 453 N.W.2d 127 (1990), abrogated, in part, on other grounds by State v. Felix, 2012 WI 36, ¶42, 339 Wis. 2d 670, 811 N.W.2d 775. "[T]he curtilage is the area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life and therefore has been considered part of [the] home itself for Fourth Amendment purposes." Oliver v. United States, 466 U.S. 170, 180 (1984) (internal quotation marks and citation omitted). The Fourth Amendment's protection against warrantless entry for arrest also has been reasoned to extend to places where the person "has a legitimate expectation of privacy in the invaded place." Minnesota v. Olson, 495 U.S. 91, 95 (1990) (internal quotation marks and citation omitted); United States v. Gooch, 6 F.3d 673, 676-77 (9th Cir. 1993) (recognizing reasonable expectation of privacy in a tent located on public campgrounds such that warrantless arrest of inhabitant requires exigent circumstances). We consider both constitutional contentions in turn.

11

## 1. Curtilage

¶24 Prior to undertaking a case specific curtilage analysis, however, it is necessary to first discuss existing Wisconsin and Supreme Court law with respect to the Fourth Amendment's protection of a home's curtilage. Dumstrey points us to Conrad v. State, 63 Wis. 2d 616, 633, 218 N.W.2d 252 (1974), in support of the proposition that common space in the basement of an apartment building is "clearly within the curtilage" of the home. In Conrad, we considered whether the police conducted an unconstitutional search when they excavated a dead body approximately 450 feet from the defendant's house on his 40 acre farm. Id. at 620-21. We rejected any trespassory, curtilage analysis in favor of a reasonable expectation analysis and held that there was no unconstitutional search because the defendant harbored no reasonable expectation of privacy in the area of his property in question. Id. at 633-34.

¶25 In so holding, we relied on the Supreme Court's Katz decision, wherein the Court held that a search need not result from a physical trespass in order to be unreasonable under the Fourth Amendment. Katz, 389 U.S. at 352. Rather, a search may be unconstitutional in an area where a person holds a reasonable expectation of privacy. Id. at 352-53, 360-61 (Harlan, J., concurring).

¶26 We stated in Conrad that "[t]he importance of Katz is . . . that it foretold the possibility that, even in a place traditionally thought to be an area protected by the [F]ourth [A]mendment, protection would not be afforded in the absence of

12

a subjective intent to exercise a reasonable expectation of privacy." Conrad, 63 Wis. 2d at 627. Based on this proposition, we stated that Katz modified the previous curtilage analysis and effectively held that there could be no unconstitutional search of curtilage unless the defendant also held a reasonable expectation of privacy in that same area. Id. at 630-31. As further support for this proposition, we cited a previous opinion, Watkins v. State, 59 Wis. 2d 514, 208 N.W.2d 449 (1973) (per curiam), wherein we held that a warrantless search of a storage room in the basement of an apartment building did not violate the Fourth Amendment. Id. at 514-15. In Watkins, we did not relate a curtilage analysis but, rather, held that the defendant harbored no reasonable expectation of privacy in the area. Id.

¶27 In Conrad, we reasoned that the Katz test limited the curtilage test. We said,

> [I]t appears that the rule of Katz, as explained by Wattenburg, is an explication or modification based on present-day concepts of the ancient curtilage test. It is also a limitation of it. Under the strict curtilage test, the subjective element of a reasonable expectation of privacy was omitted. There was, in effect, a legal presumption that all within the curtilage was protected.

Conrad, 63 Wis. 2d at 630. Conrad was a search case.

¶28 Recently, however, the Supreme Court has clarified that "Fourth Amendment rights do not rise or fall with the Katz formulation." Jones, 132 S. Ct. at 950. Rather, "the Katz reasonable-expectation-of-privacy test has been added to, not

13

substituted for, the common-law trespassory test." Id. at 952. Like Conrad, Jones is a search case.

¶29 In Florida v. Jardines, __ U.S. __, 133 S. Ct. 1409 (2013), another search case, the Supreme Court confirmed that the curtilage of a person's home remains a constitutionally protected area without consideration of whether a reasonable expectation of privacy exists. There, the Court held that the front porch of a home constitutes curtilage and that officers executed an unconstitutional search when they conducted a trespassory dog sniff on that constitutionally protected area. Id. at 1415-17. In so holding, the Court harkened back to the reasoning behind the Fourth Amendment's heightened protection of the home, stating that at its "very core stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." Id. at 1414 (internal quotation marks omitted) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).

¶30 Given the Supreme Court's recent emphasis on the distinction between the trespassory, curtilage analysis and the reasonable expectation analysis, we conclude that our statements in Conrad, 63 Wis. 2d at 627, 630-31, may be read as inconsistent with that distinction.[6] However, if we are to

---

[6] Similarly, in State v. Martwick, 2000 WI 5, ¶31 n.13, 231 Wis. 2d 801, 604 N.W.2d 552, we stated that "the privacy issue is interwoven with the curtilage determination and need not be considered separately." While it may be true that the two inquiries sometimes overlap, this approach may not accurately relate the current state of the law.

14

employ the same trespassory, curtilage analysis to a seizure as has been applied to a search, we must consider separate and distinct from a reasonable expectation of privacy whether the area in question is constitutionally protected curtilage.

¶31 We previously have conducted a curtilage analysis to determine whether an arrest occurring within curtilage of a home violates the Fourth Amendment's protection against warrantless entry. Walker, 154 Wis. 2d at 182. In Walker, police entered a resident's fenced-in backyard without a warrant in order to arrest him. Id. In determining whether the arrest was lawful, we stated:

> Read together, Payton and Oliver require that police obtain a warrant before entering either the home or its curtilage to make an arrest absent probable cause and exigent circumstances. Under Payton and Oliver, therefore, absent probable cause and exigent circumstances, [the defendant]'s warrantless arrest, although not occurring in his home, was unlawful if his fenced-in backyard falls within the curtilage of his home.

Id. at 183. We went on to conclude that the fenced-in backyard constituted curtilage of the home, thereby warranting the Fourth Amendment's protection against warrantless entry for arrest. Id. at 184. Other states and federal courts are in accord with this approach, holding that an arrest occurring outside of the home may be unlawful depending upon the nature of the area in question. See, e.g., United States v. Struckman, 603 F.3d 731, 739 (9th Cir. 2010) (recognizing that curtilage garners the home's protection against warrantless entry for arrest); United States v. Brown, 510 F.3d 57, 64 (1st Cir. 2007) (conducting

15

curtilage analysis with respect to driveway and noting the principles applicable to driveways when determining whether resident was arrested in violation of protection against warrantless entry); State v. Lewis, 675 N.W.2d 516, 523-26 (Iowa 2004) (conducting curtilage analysis for an unsecured driveway in determining whether defendant was arrested in violation of Fourth Amendment's protection against warrantless entry); State v. Karle, 759 N.E.2d 815, 819-20 (Ohio Ct. App. 2001) (holding that arrest "immediately outside" of defendant's house violated Fourth Amendment); Jefferson v. Commonwealth, 497 S.E.2d 474, 480-81 (Va. Ct. App. 1998) (holding that arrest by the back door of defendant's house was unlawful); State v. Mierz, 866 P.2d 65, 70-71 (Wash. Ct. App. 1994) (holding that arrest in backyard violated Fourth Amendment).[7]   We now turn to the discussion of

---

[7] We recognize that there may be an eventual difficulty in reconciling the notion that curtilage is afforded the same protections as the home against warrantless entry for arrest with the Supreme Court's holding in United States v. Santana, 427 U.S. 38 (1976).  In Santana, the resident of a home was initially seen by police while standing in the doorway of her home, which the Court characterized as a "public place" because she was "exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house."  Id. at 42.  The police had probable cause to arrest the resident prior to seeing her in the doorway and began to approach her, at which time she "retreated into the vestibule of her house."  Id. at 40.  The police followed the resident into her house and arrested her.  Id. at 40-41.  The Court held that, since the police initially saw the resident standing in a "public place" and then hotly pursued her into the home, the in-home arrest was justified by exigent circumstances.  Id. at 42-43.  Santana is a seizure case.

(continued)

16

whether the parking garage constitutes curtilage of Dumstrey's home.

¶32 We previously have adopted four factors set forth by the Supreme Court, United States v. Dunn, 480 U.S. 294, 301 (1987), relevant to conducting an analysis of whether an area constitutes curtilage of a home. We consider (1) "the proximity of the area claimed to be curtilage to the home"; (2) "whether the area is included within an enclosure surrounding the home"; (3) "the nature of the uses to which the area is put[;] and" (4) "the steps taken by the resident to protect the area from observation by people passing by." Martwick, 231 Wis. 2d 801, ¶30 (quoting Dunn, 480 U.S. at 301). However, we do not "mechanically" apply these factors as part of a "finely tuned formula." Dunn, 480 U.S. at 301. Instead, the factors "are useful analytical tools only to the degree that, in any given

---

In spite of the Supreme Court's characterization of the front doorway as a "public place" without any reference to curtilage, the Supreme Court also has stated that the front porch is the "classic exemplar" of a home's curtilage. Florida v. Jardines, __ U.S. __, 133 S. Ct. 1409, 1415 (2013). Jardines is a search case. This causes us to wonder whether there may be instances in which an area constitutes constitutionally protected curtilage for one purpose, such as a warrantless search, while not for another purpose, such as a warrantless arrest.

While we note this interesting dichotomy and recognize that there may be potential difficulty in reconciling Walker's protection against warrantless arrest on curtilage with Santana, see State v. Walker, 154 Wis. 2d 158, 184 n.16, 453 N.W.2d 127 (1990), Dumstrey's case does not present the proper factual scenario for us to define these specific contours today.

17

case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id.

¶33 As indicated above, Dumstrey relies on our passing statement in Conrad that the common storage area in an apartment building's basement was "clearly within the curtilage" of the home. Conrad, 63 Wis. 2d at 633. We are not persuaded. Notably, the apartment's common storage area was not at issue in Conrad. See generally Conrad, 63 Wis. 2d 616. Rather, we held in Watkins that such an area was not protected given the lack of a reasonable expectation of privacy. Watkins, 59 Wis. 2d at 514-15. In Conrad, we engaged in no analysis of why such an area would "clearly" constitute curtilage. See Conrad, 63 Wis. 2d at 633. Additionally, it is important to note that this statement in Conrad was prior to the Supreme Count's delineation of the Dunn factors. Therefore, we decline to rely upon this passing remark in Conrad to support the proposition that a common area beneath an apartment building constitutes curtilage of the home. Rather, we consider the Dunn factors as set forth by the Supreme Court.

a. proximity to the home

¶34 First, we look to the proximity of the parking garage to Dumstrey's home. The United States Court of Appeals for the First Circuit has held that, in an apartment building, "a tenant's [home] cannot reasonably be said to extend beyond his [or her] own apartment and perhaps any separate areas subject to

18

his [or her] exclusive control." United States v. Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976). We tend to agree.

¶35 It is important to distinguish between the apartment building and Dumstrey's actual home. While the parking garage is located directly beneath the entire apartment building, it does not follow that it is therefore closely proximate to Dumstrey's home. His home cannot reasonably be said to constitute the entire apartment building. Rather, Dumstrey occupies only one of the 30 units located within the building. This is a far cry from a single family home's attached garage, which courts have consistently held constitutes curtilage. See State v. Davis, 2011 WI App 74, ¶12, 333 Wis. 2d 490, 798 N.W.2d 902 (collecting cases and citing State v. Leutenegger, 2004 WI App 127, ¶21 n.5, 275 Wis. 2d 512, 685 N.W.2d 536 (recognizing that cases consistently "hold that an attached garage is part of the curtilage")).

¶36 In such cases, the garage is quite literally attached to the resident's home itself. For example, in Davis, 333 Wis. 2d 490, ¶3, the garage was attached to the resident's single family trailer home by a connecting foyer. The court of appeals accepted the garage's characterization as curtilage, and noted that "[t]he extent of the curtilage depends upon the nature of the premises, and might be interpreted more liberally in the case of a rural single-owner home, as opposed to an urban apartment." Id., ¶9; see also State v. O'Brien, 223 Wis. 2d 303, 316, 588 N.W.2d 8 (1999) (acknowledging importance of rural

19

setting in determining that car parked 200 feet away from home was located on curtilage).

¶37 In Dumstrey's case, the garage is not similarly attached to his home itself but, rather, his home could be located anywhere within the entire 30-unit apartment building. Dumstrey takes an elevator from the parking garage, potentially up several levels, to gain access to the floor on which his home is located. We do not consider this to be closely proximate for Fourth Amendment purposes. Surely, his 29 fellow tenants would not consider their individual apartments to be a part of Dumstrey's home, and Dumstrey could not reasonably contend otherwise.

b.  enclosure surrounding the home

¶38 Second, we consider whether the parking garage is included within an enclosure that also surrounds Dumstrey's home. According to testimony, the parking garage is located within the same overall structure as the apartment building in which Dumstrey's home is located. Tenants may gain direct access to the parking garage through a door located within the apartment building. From there, tenants have access to an elevator that allows them more convenient entry to their individual homes.

¶39 That the parking garage is included within the enclosure of the entire apartment building could tend to favor the garage being part of his home's curtilage. However, we note that, under this same rationale, Dumstrey's 29 fellow tenants' apartments are likewise included within the same enclosure as

20

his own apartment. As indicated above, it cannot reasonably be contended that each of these tenants' homes constitutes part of Dumstrey's home for purposes of the Fourth Amendment. Therefore, we are not persuaded by the parking garage being included within the overall enclosure that encompasses the entire apartment building.

### c. nature of use

¶40 Next, we look to the nature of the uses to which Dumstrey puts the parking garage. The overall curtilage inquiry is directed at protecting "the area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." Oliver, 466 U.S. at 180 (internal quotation marks and citation omitted).

¶41 Dumstrey relies on the dissent from the court of appeals decision, suggesting that he utilizes the parking garage in the same manner as other Wisconsinites use attached garages on their single family homes. Dumstrey, 359 Wis. 2d 624, ¶23 (Reilly, J., dissenting). Namely, Dumstrey parks his car in the parking garage in order to be free from the elements, including frigid winters. Id. The dissent from the court of appeals characterizes this use as one associated with the "privacies of life." Id. However, to the contrary, courts seem overwhelmingly to hold that parking alone constitutes a use associated with neither an intimate activity of the home nor a privacy of life. See, e.g., Mack v. City of Abilene, 461 F.3d 547 (5th Cir. 2006) (collecting cases and indicating that common parking area is not a use associated with curtilage of home);

21

Commonwealth v. McCarthy, 705 N.E.2d 1110 (Mass. 1999) (noting that regular and intended use for tenant parking does not give rise to curtilage designation); State v. Harnisch, 931 P.2d 1359, 1364 (Nev. 1997) (holding that parking in designated parking space open to view does not constitute "'intimate activities of the home' or the 'privacies of [] life'"), disapproved of on other grounds by State v. Lloyd, 312 P.3d 467 (Nev. 2013); State v. Williford, 767 S.E.2d 139, 142-43 (N.C. Ct. App. 2015) (collecting parking lot cases).

¶42 The uncontroverted testimony establishes that Dumstrey utilizes the parking garage solely for parking his vehicle. He puts the area to no other use such as storing personal belongings in an exclusively controlled area or conducting other personal activities such as we would equate with a garage attached to a single family home. While we conclude that Dumstrey's use does not warrant curtilage designation, we do not foreclose the possibility that some additional use of a somewhat comparable garage could constitute a use associated with intimate activity of the home or privacy of life.

d. protection from observation

¶43 Finally, we look to the steps Dumstrey has taken to protect the parking garage from observation by passersby within the garage. Dumstrey asserts that the entire parking garage is generally not open to the public since it is enclosed and accessible only through either the remote controlled garage door or the locked door on the inside of the apartment building. He contends that, since he pays for his assigned parking place in

22

the garage, he has taken affirmative steps to protect the area from observation by people passing by the apartment building and enclosed garage.

¶44 The relevant inquiry, however, is not whether the parking garage is generally shielded from the public at large. Rather, we are concerned with whether Dumstrey has taken steps to shield the parking area from the view of passersby within the parking garage. As the Supreme Court of Massachusetts has noted with respect to an apartment building's enclosed parking area, "it is an enclosure encompassing a common area utilized by all the tenants and visitors of the building." McCarthy, 705 N.E.2d at 1113. In holding that such an enclosed parking area did not constitute curtilage of the home, the court noted that there was nothing preventing anyone entering the lot from observing the individual parking places. Id. Therefore, no steps were taken to protect the vehicle or the parking place from observation. See id.

¶45 Similarly, all of Dumstrey's 29 fellow tenants and their guests are free to enter the parking garage. Upon their entrance, Dumstrey cannot prevent such individuals from observing the parking area within the interior of the parking garage. Each day, countless tenants are not only free to, but are required to, pass through the parking garage in order to get from their own vehicles to the elevator to access their homes. Of course, this is in addition to any visitors of the 29 other tenants or of the landlord. Consequently, Dumstrey has simply

taken no steps to protect the parking garage from observation by passersby within the garage.

¶46 The foregoing factors do not weigh in favor of curtilage designation. Accordingly, we conclude that the parking garage is not so intimately tied to Dumstrey's home that it warrants Fourth Amendment protection as curtilage of his home. We now proceed to determine whether Dumstrey harbors a reasonable expectation of privacy in the parking garage for some other reason, such that it warrants Fourth Amendment protection against warrantless entry for arrest. See Olson, 495 U.S. at 95.

2. Reasonable expectation of privacy

¶47 To make this determination, we consider two questions: (1) whether the person exhibits an actual, subjective expectation of privacy in the area; and (2) whether society is willing to recognize such an expectation as reasonable. Smith v. Maryland, 442 U.S. 735, 740 (1979); State v. Rewolinski, 159 Wis. 2d 1, 13, 464 N.W.2d 401 (1990); State v. Eskridge, 2002 WI App 158, ¶11, 256 Wis. 2d 314, 647 N.W.2d 434. The ultimate inquiry depends on the totality of circumstances. Rewolinski, 159 Wis. 2d at 17. In answering these questions, we have identified six factors as relevant: "(1) whether the defendant had a property interest in the premises; (2) whether he [or she] was legitimately (lawfully) on the premises; (3) whether he [or she] had complete dominion and control and the right to exclude others; (4) whether he [or she] took precautions customarily taken by those seeking privacy; (5) whether he [or she] put the

24

property to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy." Id. at 17-18; Eskridge, 256 Wis. 2d 314, ¶15.

¶48 We are satisfied that the first two factors cut in favor of Dumstrey's reasonable expectation of privacy. Specifically, Dumstrey has a personal property interest in his parking place in the garage because he lives in the apartment building and pays for his assigned parking location. There is likewise no dispute over whether Dumstrey was lawfully on the premises. He opened the garage door with his remote controlled opener and parked his vehicle in his assigned place prior to being seized by Officer DeJarlais. The remaining factors, however, are not similarly helpful to Dumstrey.

¶49 Dumstrey has shown no dominion and control over the parking garage. As set forth above, he has no right to exclude the 29 other tenants or their guests, all of whom have the same right of access as he. This is the antithesis of dominion and control over the premises. Moreover, while the parking garage is shielded from the public at large, he has taken no precautions to seek privacy within the garage from the countless strangers that could be present daily. Additionally, Dumstrey puts the garage to no use in addition to parking his vehicle. With the 29 other tenants putting the garage to this same use, Dumstrey's use can in no way be considered "private." Finally, we are convinced that historical notions of privacy are simply not consistent with such a large number of people having the same right of access to the parking garage as Dumstrey himself.

25

"[C]ommon areas in apartment buildings are, by their very definition, not private but shared areas, accessible to and used by other tenants." Eskridge, 256 Wis. 2d 314, ¶19.

¶50 Under the totality of circumstances, we doubt that Dumstrey harbors any actual expectation of privacy in the parking garage, and if he does, such an expectation is surely not reasonable. However, we do not foreclose the possibility that a person may exhibit a reasonable expectation of privacy in a smaller, more intimate multi-unit dwelling. See State v. Trecroci, 2001 WI App 126, ¶40, 246 Wis. 2d 261, 630 N.W.2d 555 (distinguishing between large apartment complex and a smaller apartment house for purposes of reasonable expectation analysis).

IV. CONCLUSION

¶51 In light of the foregoing, we conclude that the parking garage underneath this apartment building does not constitute curtilage of Dumstrey's home. We further conclude that Dumstrey has shown no reasonable expectation of privacy in the garage. Consequently, Dumstrey's stop and subsequent arrest in the garage did not violate the Fourth Amendment's prohibition against unreasonable seizures. Stated otherwise, the seizure did not occur after a warrantless entry into a constitutionally protected area. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶52 REBECCA G. BRADLEY, J., did not participate.

26

¶53 DAVID T. PROSSER, J. *(concurring)*. The majority opinion concludes that "the parking garage underneath this apartment building does not constitute curtilage of Dumstrey's home." Majority op., ¶4. I join the majority opinion in this conclusion and agree with its analysis in reaching it. In my view, the opinion does not preclude a different conclusion if there were materially different facts.

¶54 The majority opinion also concludes that "Dumstrey has shown no reasonable expectation of privacy" in this parking garage. Id. I also join the majority opinion in this conclusion.

¶55 I write separately because the opinion states the central question to be "whether the parking garage underneath the apartment building constitutes curtilage of Dumstrey's home such that it is protected by the Fourth Amendment." Id., ¶3 (emphasis added). Implicit in this question is the principle that police may not arrest a person on probable cause if the person is found within the curtilage of the person's home unless the police have an arrest warrant or there is a well-recognized exception to the warrant requirement such as exigent circumstances. I do not agree with a broad principle that police may not arrest a person on probable cause when the person is within the person's own curtilage but not within the home. In my view, a broad principle to this effect would constitute a serious mistake of law and an impractical hardship for law enforcement.

1

¶56 "[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." <u>Elkins v. United States</u>, 364 U.S. 206, 222 (1960). As the majority recognizes, "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Majority op., ¶22 (quoting <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980)). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 748 (1984) (quoting <u>United States v. United States District Court</u>, 407 U.S. 297, 313 (1972)).

¶57 In <u>State v. Walker</u>, 154 Wis. 2d 158, 453 N.W.2d 127 (1990), our court extended the Fourth Amendment's protection against unreasonable seizures to curtilage:

> In deciding whether Walker's arrest was lawful, we begin by examining the nature of the protection that the fourth amendment provides to the home and the land next to the home. In <u>Payton v. New York</u>, 445 U.S. 573 (1980), the United States Supreme Court held that the fourth amendment, made applicable to the states by the fourteenth amendment, prohibits police from making a warrantless and nonconsensual entry into a felony suspect's home to arrest the suspect, absent probable cause and exigent circumstances. The Court has also determined that the fourth amendment protections that attach to the home likewise attach to the curtilage, which is defined generally as "the land immediately surrounding and associated with the home." <u>Oliver v. United States</u>, 466 U.S. 170, 180 (1984). In <u>Oliver</u>, the Court reasoned that the curtilage receives the fourth amendment protections that attach to the home because, "[a]t common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" <u>Id.</u> (quoting <u>Boyd v. United States</u>, 116 U.S. 616, 630 (1886)).

2

Read together, Payton and Oliver require that police obtain a warrant before entering either the home or its curtilage to make an arrest absent probable cause and exigent circumstances. Under Payton and Oliver, therefore, absent probable cause and exigent circumstances, Walker's warrantless arrest, although not occurring in his home, was unlawful if his fenced-in backyard falls within the curtilage of his home.

Walker, 154 Wis. 2d at 182-83 (footnote omitted).

¶58 In my view, the Walker opinion took considerable liberty with Oliver, which was a search case involving open fields, and was striving to distinguish open fields from curtilage. The Oliver Court noted that "the common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields." Oliver, 466 U.S. at 180.

¶59 Surely, no expectation of privacy legitimately attaches to a person's driveway or front yard, or even a backyard without special fencing, that is completely open to public view. "[T]he warrantless arrest of an individual in a public place upon probable cause [does] not violate the Fourth Amendment," and "[w]hat a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." United States v. Santana, 427 U.S. 38, 42 (1976) (first citing United States v. Watson, 423 U.S. 411 (1976); then quoting Katz v. United States, 389 U.S. 347, 351 (1967)).

¶60 Even the Walker court, in distinguishing Santana, recognized that police might make an arrest on curtilage if the curtilage is open to public view:

The threshold of one's house is a place[,] although on private property, that is used by various members of

3

the public and is visible to any person that passes by the house. A fenced-in backyard, on the other hand, is not an area accessible to the public, and one is normally not visible to those passing by the front of the house.

Walker, 154 Wis. 2d at 184 n.16. Consequently, the law of arrest may well be different from the law of search in relation to curtilage.

¶61 The Wayne LaFave treatise on search and seizure discusses curtilage arrests in a section entitled "Basis for Entry to Arrest":

The cases involving arrests made on the premises (in the broad sense of that term) outside rather than inside the threshold deserve some attention at this point, for quite similar considerations govern there. Typically by reliance upon the Payton declaration that ordinarily the "threshold may not reasonably be crossed without a warrant," the courts have upheld warrantless arrests made in such places as the common hallway of an apartment building, or the yard[191] driveway,[192] or porch[193] or carport[194] of a house. (There are conceivably special circumstances, however, in which some such place would carry with it such a high expectation of privacy that the Payton rule should govern.)

3 Wayne R. LaFave, Search & Seizure § 6.1(e), at 405-06 (5th ed. 2012) (footnotes omitted).

¶62 Footnotes 191-194 list multiple cases. Footnote 191 reads in part: "Contra: State v. Walker, 154 Wis. 2d 158, 453 N.W.2d 127 (1990)" and quotes a sentence from Walker.

¶63 In a later supplement to footnote 191, LaFave states:

Walker does not stand alone, as there is other authority to the effect that the on-curtilage lawful arrest limitations are just as stringent as those applicable to in-premises arrest. See note 57 supra. But, while the in-premises analogy arguably makes sense when the arrest occurs upon a part of the curtilage not open to visitors generally, e.g., the

4

back yard in Walker, it hardly follows that the same should be true regarding the arrest of someone who, e.g., steps out onto his front porch at police request and then is apprehended there.

3 LaFave § 6.1(e) n.191, at 52 (Supp. 2015).

¶64 The majority opinion cites six cases for the proposition that the Fourth Amendment prohibits entry onto curtilage for the purpose of making a warrantless arrest: United States v. Struckman, 603 F.3d 731, 739 (9th Cir. 2010); United States v. Brown, 510 F.3d 57, 64 (1st Cir. 2007); State v. Lewis, 675 N.W.2d 516, 523-26 (Iowa 2004); State v. Karle, 759 N.E.2d 815, 819-20 (Ohio Ct. App. 2001); Jefferson v. Commonwealth, 497 S.E.2d 474, 480-81 (Va. Ct. App. 1998); and State v. Mierz, 866 P.2d 65, 70-71 (Wash. Ct. App. 1994). Additional cases may be cited. See 3 LaFave § 6.1(b) n.57, at 50 (Supp. 2015).

¶65 The ambiguity in some of these cases requires comment. Despite making broad statements regarding Fourth Amendment protections on curtilage, these courts have hesitated to foreclose all arrests on curtilage that is open to public view. For example, in the Brown case, the court dutifully observed:

> The Fourth Amendment protects persons from warrantless arrest inside their homes or other places where they have a reasonable expectation of privacy. One such place is the curtilage of the home. Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000). Brown argues that he was standing in the curtilage of his home when he was arrested, and since the police lacked a warrant, the arrest violated the Fourth Amendment.

Brown, 510 F.3d at 64 (citations omitted).

¶66 However, Brown was standing in his driveway, and the court concluded that the driveway adjacent to his garage next to

5

his trailer home was not part of the home's curtilage: "[O]ur past cases reveal a number of general principles with respect to driveways. If the relevant part of the driveway is freely exposed to public view, it does not fall within the curtilage." Id. at 65.

¶67 In the Lewis case from Iowa, the court stated that "[t]he protection provided by the Fourth Amendment has been extended to the curtilage." Lewis, 675 N.W.2d at 523. However, concerning the driveway adjacent to Lewis's home, "[W]e find the driveway was not within the curtilage." Id.

¶68 In the Karle case, the Ohio Court of Appeals found an arrest of the defendant "immediately outside his house" unlawful because the police did not have an arrest warrant. Karle, 759 N.E.2d at 820. However, the court was quick to add:

> As this court has held, "[a]n arrest in contravention of the Fourth Amendment will not a fortiori preclude subsequent criminal proceedings predicated upon the arrest. Rather, the exclusionary rule provides only that evidence derived from an illegal seizure——fruit of the poisonous tree——is subject to exclusion at trial.

Id. at 821 (citation omitted).

¶69 In State v. Mierz, from Washington, the court determined that there was an unlawful arrest in defendant's backyard that "was clearly not open to public use." Mierz, 866 P.2d at 71. However, the court stated that "the police may enter areas of the curtilage that are impliedly open," and it cited a Washington Supreme Court decision, State v. Solberg, 861 P.2d 460 (Wash. 1993), in which the court "upheld a warrantless

6

arrest on a front porch of a home." Mierz, 866 P.2d at 71 & n.7.

¶70 This concurrence does not attempt to be a comprehensive exegesis of the subject of warrantless arrest on a defendant's curtilage. It is, however, intended to suggest that the language in the Walker case is too broad and that some courts that "talk the talk" do not "walk the walk" because walking the walk would make little sense in light of other United States Supreme Court precedent.[1] When the Payton rule is followed, the law is clear. When the Payton rule is extended to curtilage, the law will be open to constant dispute.

¶71 I am authorized to state that Justice MICHAEL J. GABLEMAN joins this concurrence.

---

[1] One post-2009 unpublished case by the Wisconsin court of appeals, citable for persuasive purposes, seems to limit Walker. In State v. Wieczorek, No. 2011AP1184-CR, unpublished slip op. (Wis. Ct. App. Nov. 8, 2011), an officer responded to a driver's home after receiving a dispatch regarding a hit and run. Wieczorek, unpublished slip op., ¶¶3-5. After knocking on the front door and engaging with the suspected drunk driver, the officer arrested the suspect on the suspect's porch. Id., ¶6. The circuit court concluded that the officer unconstitutionally seized the driver "because the seizure took place in the curtilage of his home," id., ¶8, but the court of appeals reversed, reasoning that the circuit court "erred by determining by reason of analogy that [the driver] had the same reasonable expectation of privacy in his front porch as the defendant in Walker had in his fenced-in backyard," id., ¶12. Rather than treating Walker as creating a per se rule prohibiting arrest on curtilage, the Wieczorek court preferred a case-by-case analysis of the privacy interests that would support or prohibit an arrest. Id., ¶¶11-12.

¶72 ANN WALSH BRADLEY, J. *(dissenting).* The majority's application of the Fourth Amendment's protections creates a great inequity among the people of Wisconsin. The Fourth Amendment protects the "right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures..."

¶73 It does not distinguish among the types of dwellings we call home, giving one more protection than another. There is no room in the language for this court to do otherwise. Nevertheless, under the majority opinion, the protections of the home now apparently depend on whether an individual lives in a single-family or multi-family dwelling.

¶74 The majority concludes that Dumstrey's locked underground parking garage that is attached to his apartment building is not curtilage. Majority op., ¶51. As a result, it allows the Government to forcibly enter Dumstrey's locked, underground parking garage without a warrant.

¶75 The analysis of the majority is infirm in a number of ways: (1) it conflates curtilage with a reasonable expectation of privacy; (2) it skews the analysis by shifting the focus onto the other tenants in Dumstrey's building, rather than on the government; and (3) it disregards controlling Supreme Court precedent. Perhaps its biggest infirmity is that it ignores the collective right that residents of apartments or condominiums have to exclude all individuals that do not have a legitimate purpose on their property.

¶76 Contrary to the majority, I conclude that the parking garage here is curtilage. As a result, the government's warrantless, non-consensual intrusion into Dumstrey's parking garage and the resulting search and seizure, violated Dumstrey's Fourth Amendment rights. Accordingly, I respectfully dissent.

I

¶77 The primary issue presented is whether Dumstrey's garage is curtilage. If it is, then it is considered part of the home for Fourth Amendment purposes.

¶78 "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961). "[T]he right to retreat would be significantly diminished if police could enter a man's property to observe his repose from just outside the front window. We therefore regard the area 'immediately surrounding and associated with the home'——what our cases call the curtilage——as 'part of the home itself for Fourth Amendment purposes.' That principle has ancient and durable roots." Id. (internal citation omitted).

¶79 The determination of whether Dumstrey's parking garage is curtilage presents a fact specific analysis. See, e.g., State v. Leutenegger, 2004 WI App 127, ¶21 n.5, 275 Wis. 2d 512, 685 N.W.2d 536. The facts of this case are not in dispute.

2

¶80  Officer DeJarlais was off-duty, on his way home from a Milwaukee Brewers baseball game where he had a couple of beers when he first observed Dumstrey.  After observing Dumstrey tailgating and passing other cars, Officer DeJarlais pulled up next to Dumstrey at a red light. Officer DeJarlais was not wearing a police uniform and was driving his own personal vehicle.

¶81  While both vehicles were stopped at a red light, Officer DeJarlais flashed his badge at Dumstrey, and verbally commanded him to wait for the police.  Dumstrey stared at Officer DeJarlais with a blank look on his face. When the light turned green, Officer DeJarlais went through the intersection and pulled over.  Dumstrey eventually proceeded through the intersection and pulled up next to Officer DeJarlais.  Again, Dumstrey did not say anything to Officer DeJarlais, stared at him, and drove away.

¶82  Officer DeJarlais followed Dumstrey into the driveway of an apartment building's parking lot.  He watched Dumstrey enter an underground parking garage using a remote control to enter the locked garage door.  After following Dumstrey into the underground parking garage, Officer DeJarlais parked his car directly under the door to immobilize it, de-activating the security system.  When Officer DeJarlais exited his car and made contact with Dumstrey in the parking garage, Dumstrey commented that he did not believe DeJarlais was a police officer.

¶83  Dumstrey's parking garage is underground, locked and secured from the general public.  Only tenants who pay for a

3

parking spot can access the garage or use the elevator connecting the apartment building to the underground garage.

¶84 The State acknowledged that if the garage door had closed before DeJarlais forced it to remain open, it would have been unreasonable under the Fourth Amendment for the State to forcibly break and enter through the garage door to search. Even the majority acknowledges that "Dumstrey has a personal property interest in his parking place in the garage because he lives in the apartment building and pays for his assigned parking location." Majority op., ¶48.

¶85 At the outset of its curtilage analysis, the majority at length discusses Katz v. United States, 389 U.S. 348 (1967). Katz considered whether government conduct constituted an unlawful search in violation of the Fourth Amendment by applying the reasonable expectation of privacy test. Id. However, recent United States Supreme Court precedent requires that curtilage be analyzed separately from a reasonable expectation of privacy. See United States v. Jones, 132 S. Ct. 945, 952-953 (2012); see also Jardines, 133 S. Ct. at 1417.

¶86 In Jones, the Supreme Court held that the installation of a GPS unit on an individual's vehicle, even if he had no reasonable expectation of privacy, was a search. 132 S. Ct. at 949 (2012). The court explained that "Jones's Fourth Amendment rights do not rise or fall with the Katz [reasonable expectation of privacy] formulation." Id. at 950. Jones is clear that the "Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." Id. at

4

952 (emphasis in the original). Thus, after Jones, there are now two separate avenues for finding a violation of the Fourth Amendment: (1) trespass of property rights; and (2) a reasonable expectation of privacy.

¶87 In Jardines, the Supreme Court held that a police officer's use of a trained police dog on a homeowner's porch was a search within the meaning of the Fourth Amendment. 133 S. Ct. at 1417-18. The court explained that "[a]t the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" 133 S. Ct. at 1414 (quoting Silverman, 365 U.S. at 511). The Jardines decision reinvigorated a test based on trespass of property, emphasizing the importance of property rights, even in an area of the home that is semi-public. See also United States v. Burston, __ F.3d __, 2015 WL 7444379 (8th Cir. 2015) (concluding that a grassy area surrounding an apartment was curtilage).

¶88 As the Jardines court acknowledged, the porch of a home is a semi-public area. "[T]he knocker on the front door "is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." Jardines, 133 S. Ct. at 1415. An implicit license allows the general public to approach the porch, which is curtilage, and either be received or asked to leave. Id. Thus, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Id. at 1416 (quoting

5

Kentucky v. King, 131 S. Ct. 1849, 1862 (2011)). "The scope of a license-express or implied-is limited not only to a particular area but also to a specific purpose." Id. Accordingly, curtilage may be semi-public for certain purposes and yet still protected from government intrusion.

¶89 After Jones and Jardines, courts must analyze first the trespass doctrine separately from the Katz "reasonable expectation of privacy test." Prior federal and state precedent holding that an area is not curtilage based on the Katz "reasonable expectation of privacy test" is no longer controlling. Under the current state of the law, we must weigh property rights more heavily than privacy considerations. The analysis is not whether the area is completely private. Rather, it is whether Dumstrey has a sufficient property interest that would entitle him to be free from government intrusion in this area.

¶90 In examining the contours of curtilage, courts look to United States v. Dunn, where the court identified four factors for determining whether an area is curtilage protected by the Fourth Amendment: (1) the proximity of the area to the home; (2) whether the area was within an enclosure surrounding the home; (3) the nature of the uses to which the area was put; and (4) the steps taken to protect the area from observation by passers-by. 480 U.S. 294, 301 (1987).

¶91 The Dunn factors are not a precise formula, but are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration——

6

whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. Although they fail to consider some of the realities of modern urban living, the factors nevertheless are helpful and Dunn remains a quintessential curtilage case.

A.

¶92 With the relevant facts and law in mind, we begin our curtilage discussion with the first Dunn factor: proximity to the home. Analyzing the garage's proximity to the home, the majority relies on United States v. Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976), for the proposition that in an apartment building "a tenant's [home] cannot reasonably be said to extend beyond his [or her] own apartment and perhaps any separate areas subject to his [or her] exclusive control." Majority op., ¶34.

¶93 In applying Cruz Pagan, the majority conflates a curtilage analysis with a reasonable expectation of privacy analysis. Cruz Pagan rests its determination of curtilage on the Katz reasonable expectation of privacy test. Cruz Pagan, 537 F.2d at 557 (citing Katz, 389 U.S. 347). According to Cruz Pagan, "[t]he legal question which we must resolve is whether the agents' entry into the garage defeated the reasonable expectation of privacy of any of the appellants." Id. at 557.

¶94 In addition, the Cruz Pagan court explicitly rejected the trespass analysis which we must now apply. Id. at 558 ("Whether or not the agents' entry was a technical trespass is not the relevant inquiry."). Based on the Katz test which no

7

longer applies to a curtilage analysis under Dunn, the Cruz Pagan court concluded that "a person cannot have a reasonable expectation of privacy... in such a well travelled common area of an apartment house or condominium." Id. at 588.

¶95 The majority's analysis of proximity to the home is based on the premise, set forth in Cruz Pagan, that Dumstrey's home "cannot reasonably be said to constitute the entire apartment building." Majority op., ¶35. It explains that "his 29 fellow tenants would not consider their individual apartments to be a part of Dumstrey's home, and Dumstrey could not reasonably contend otherwise." Id., ¶37. Rather than analyze the distance from the apartment building to the parking garage, the majority analyzes proximity in terms of where in the apartment building Dumstrey has a reasonable expectation of privacy.

¶96 According to the majority, if Dumstrey's individual apartment rather than the apartment building is his home, it is not proximate because he has to travel though shared hallways and use a shared elevator to get to the garage. Thus, the majority concludes that "[w]hile the parking garage is located directly beneath the entire apartment building, it does not follow that it is therefore closely proximate to Dumstrey's home." Majority op., ¶35.

¶97 Given that Cruz Pagan is not controlling as to a curtilage determination, the majority missteps in analyzing proximity only in terms of Dumstrey's individual apartment. Even if Dumstrey has to travel though common areas of his

8

apartment to get to the garage, the real question here is distance, rather than the privacy he has in the hallway or elevator while he travels to the parking garage. Additionally, Cruz Pagan pre-dates Dunn and the court did not apply the requisite Dunn curtilage factors.

¶98 In this case, the parking garage is located directly underneath Dumstrey's apartment building. Dumstrey travels from his apartment to the parking garage through a locked hallway and elevator, without ever going outside. As this Court has explained, "no bright-line rule exists for ascertaining when a distance is in close proximity, and cases are often inconsistent in this regard." State v. Martwick, 2000 WI 5, ¶33, 231 Wis. 2d 801, 604 N.W.2d 552. For example, in State v. Williford, which is cited by the majority, the court concluded that an uncovered parking lot located in front of the defendant's apartment building "was in close proximity to the building." 767 S.E.2d 139, 143 (N.C. Ct. App. 2015). If an uncovered lot in front of an apartment building is in close proximity to the home, then an underground garage that is accessible without exiting the building is surely in close proximity. Accordingly, I conclude that the parking garage is proximate to Dumstrey's home.

B.

¶99 The majority's analysis of the second Dunn factor, whether the area is enclosed, is also based on the Cruz Pagan premise that Dumstrey's home is limited to his own apartment. It reasons that even though the underground parking garage is part of the same enclosure as the apartment building,

9

"Dumstrey's 29 fellow tenants' apartments are likewise included within the same enclosure as his own apartment." Majority op., ¶39. According to the majority's analysis, the parking garage must be enclosed within the same four walls of Dumstrey's apartment only, because "it cannot reasonably be contended that each of these tenants' homes constitutes part of Dumstrey's home." Id. This logic finds no support in the law.[1]

¶100 In United States v. Perea-Rey, a post-Jones case that applied the Dunn factors, the Ninth Circuit found that a carport met the enclosure factor. 680 F.3d 1179, 1184 (2012). The carport was enclosed by a fence, blocking passersby from entering the driveway and carport. Id. at 1184-85. Although Dumstrey's parking garage was not enclosed by a fence, the locked underground parking garage could only be accessed with a garage door opener or a key for a locked door. A fence may make sense in a rural environment, but a locked garage door serves the same purpose in an urban environment.[2]

_____

[1] Although not cited in support of its "enclosure" analysis, the majority cites to a string of cases allegedly supporting its "nature of use" analysis that hold that unenclosed parking lots are not curtilage. Majority op., ¶41. Not a single case cited by the majority analyzes the enclosure in terms of whether it is contained within the four walls of an individual tenant's apartment.

[2] Although we must apply the Dunn factors, I observe that this framework is imperfect in determining curtilage in an urban setting. The curtilage factors in Dunn arose in, and apply primarily to, rural dwellings. See Carrie Leonetti, Open Fields in The Inner City: Application of the Curtilage Doctrine to Urban and Suburban Areas, 15 Geo. Mason U. Civ. Rts. L.J. 297, 311 (2005) (explaining "[o]ne of the difficulties in the application of the Dunn factors to urban areas is their epistemological reliance upon a suburban conceptual framework.
(continued)

¶101 In Coffin v. Brandau, the Eleventh Circuit determined that "entering the garage as [the defendant] attempted to close it was a violation of the Fourth Amendment." 642 F.3d 999, 1013 (11th Cir. 2011). The Brandau court concluded that the garage was enclosed because "the attached garage has walls on three sides and has the capability, if the outside door is rolled down, of being closed to maintain privacy." Id. at 1012. It is clear from Officer DeJarlais's actions that the locked garage door blocked passersby from entering Dumstrey's parking garage. The only reason Officers DeJarlais and Lichucki were able to access Dumstrey's garage was because Officer DeJarlais used his vehicle to forcibly keep the garage door open. Thus, I conclude that Dumstrey's parking garage is enclosed.

C.

¶102 In analyzing the nature of the use, the third Dunn factor, the majority cites to a string of cases that conclude unattached, unenclosed parking garages are not curtilage. See Majority Op., ¶41 (citing Williford, 767 S.E.2d at 142-43 (entry into a parking lot directly adjacent to a multi-unit apartment building); Mack v. City of Abilene, 461 F.3d 547, 554 (5th Cir. 2006) ("the parking space was in an open parking lot, the lot is a common area used for parking with multiple spaces, and a vehicle parked in the lot is not shielded from view by others"); Commonwealth v. McCarthy, 705 N.E.2d 1110, 1113 (Mass. 1999) (common parking lot with guest spaces freely visible to anyone

---

Factors like proximity to the home or the existence of a fence make sense only in a relatively rural area.").

11

entering the lot); State v. Harnish, 931 P.2d 1359, 1364 (Nev. 1997) (parking lot was open to view of the general public and not enclosed)). Based solely on this, the majority concludes that "parking alone constitutes a use associated with neither an intimate activity of the home nor a privacy of life." Majority op., ¶41.

¶103 As the dissent in the court of appeals decision recounted, "Dumstrey uses his garage in many of the same ways that middle America utilizes its garages in the 'privacies of life'-the keeping and storing of his vehicle in a secure setting, the ability to have a relatively warm vehicle during Wisconsin's frigid winters, the avoidance of wind and rain when accessing his vehicle, the safety and security of an elevator from garage to residence, and the avoidance of crime in the open streets." Dumstrey, 359 Wis. 2d 624, ¶23 (Reilly, J., dissenting). None of these uses would apply to an unenclosed, unattached lot. Accordingly, I conclude that Dumstrey's parking garage is used for the intimate activities of the home.

D.

¶104 With respect to the final Dunn factor, the steps taken to protect the area from observation by passers-by, the majority attempts to skew the focus from the government intrusion to the other tenants in the building. The majority claims that "[t]he relevant inquiry [] is not whether the parking garage is generally shielded from the public at large. Rather, we are concerned with whether Dumstrey has taken steps to shield his

12

assigned parking space from the view of passersby within the parking garage." Majority op., ¶44.

¶105 The majority's shift of exclusive focus on the other tenants finds no support in the law. Even the case the majority cites for this proposition states the opposite: "We have held that an area is not within the curtilage if it is open to public view, and is one which 'visitors and tenants on the property would pass on the way to the front door.'" Commonwealth v. McCarthy, 705 N.E.2d at 1111 (Mass. 1999) (quoting Commonwealth v. Simmons, 466 N.E.2d 85, cert. denied, 469 U.S. 861 (1984)). Dumstrey's parking garage is not open to public view, nor is it an entrance to the building though which visitors would pass because it is locked and fully enclosed.

¶106 Under Jones and Jardines, the focus ought to be on whether the garage is private property on which the government cannot trespass, not whether other tenants who share private property also have a right to be there. "The fact that Dumstrey and his cotenants share the garage does not defeat the fact that each of the tenants has secured the garage from the general public and the government through their collective actions. Dumstrey may have a lessened amount of privacy among his fellow tenants, but he and his fellow tenants retain their constitutional right to be free from unreasonable government intrusion." Dumstrey, 359 Wis. 2d 624, ¶25 (Reilly, J., dissenting).

¶107 In its attempt to bolster its skewed focus, the majority relies on McCarthy, yet the actual facts of that case

13

make it readily distinguishable. It addressed a visitor's parking space in an open parking lot. In McCarthy, the court explained that "[t]he parking space in which the defendant's car was situated when searched is not only an area that visitors would normally pass through on the way to the building, it is an area specifically designed to accommodate such use by visitors." McCarthy, 705 N.E.2d at 1113. The McCarthy court reasoned that "[b]ecause the defendant had no reasonable expectation of privacy in the visitor's parking space, the space was not within the curtilage of the defendant's apartment."[3] Id. at 1114.

¶108 Mistakenly, the majority twice describes the parking lot in McCarthy as an "enclosed parking area." Majority op., ¶44. However, in discussing McCarthy, the Supreme Judicial Court of Massachusetts commented that "the space was not enclosed in any manner." Commonwealth v. Fernandez, 934 N.E.2d 810, 816 (Mass. 2010). In fact, none of the cases cited by the majority involve a locked, enclosed parking garage. See Majority op., ¶41.

¶109 In conclusion, a curtilage analysis with the application of the Dunn factors is based on property rights and trespass, not a reasonable expectation of privacy. The proper analytical framework ought to be whether the area is protected from government intrusion, not whether other tenants also have a

---

[3] As discussed above with respect to United States v. Cruz Pagan, the McCarthy case was decided prior to Jones and is of limited analytical value because its curtilage analysis is based in part on the Katz reasonable expectation of privacy test.

14

right to use the garage. Based on the facts of this case as analyzed above, I conclude that Dumstrey's parking garage is curtilage.[4] It was in close proximity to his home, enclosed, was used for the intimate activities of home, and was protected from public view. Thus, the officers' entry into Dumstrey's garage was a trespass in violation of the Fourth Amendment.

II

¶110 From the outset, the majority needlessly differentiates between whether a search or a seizure occurred in this case.[5] Although it concludes that Dumstrey was seized in the parking garage, the majority contends that "Dumstrey was not subjected to a search while stopped in the parking garage." Majority op., ¶19. In concluding that no search occurred, the majority opinion disregards controlling United States Supreme Court precedent. See Jones, 132 S. Ct. 945. "Jones provides the bright-line rule: when government agents physically touch a person's property, then a search occurs under the Fourth

---

[4] After concluding that Dumstrey's garage is curtilage and that the police trespassed in violation of the Fourth Amendment, I do not need to reach the issue of whether Dumstrey had a reasonable expectation of privacy in the garage. Under Jones, the Katz reasonable expectation of privacy test is only applicable to cases when there was no trespass onto a constitutionally protected area. See, e.g., United States v. Jones, 132 S. Ct. 945, 953-54 (2012) (explaining that situations in which there is no trespass are still subject to the Katz reasonable expectation of privacy test).

[5] This issue was not briefed or argued by either of the parties, nor is it necessary to the outcome of the case.

15

Amendment." Paul A. Clark, Do Warrantless Breathalyzer Tests Violate the Fourth Amendment, 44 N.M. L. Rev. 89, 105 (2014).

¶111 In Jones, "[t]he Government physically occupied private property for the purpose of obtaining information." 132 S. Ct. 945, 949 (2012). The Jones court determined that "[w]e have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." Id.; see also United States v. Perea-Rey, 680 F.3d 1179, 1185 (2012) ("Warrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches."); see also Florida v. Jardines, 133 S. Ct. 1409, 1417 ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.").

¶112 The court in Perea-Rey, which is factually similar to this case, determined that a border agent's trespass into a carport was a warrantless search that violated the Fourth Amendment. 680 F.3d at 1189. In that case, a border patrol agent entered a carport attached to the side of a house. Id. at 1183. The border agent made contact with Perea-Rey in the carport and instructed him to wait in the carport until other agents arrived and arrested him. Id. Following the Supreme Court's holdings in Jones and Jardines, the Perea-Rey court applied the Dunn factors. It determined that because the carport was curtilage, the border agent had conducted a search in violation of the Fourth Amendment when he occupied the carport without a warrant. Id. at 1189.

16

¶113 Similarly, in this case, Officers DeJarlais and Lichuki occupied private property when they entered Dumstrey's parking garage without a warrant. DeJarlais deactivated the locked underground garage's security system by forcibly preventing the garage door from closing. As he testified:

> My vehicle was partially outside and the front end was inside. That way I knew when the officers got there they would be able to get into the garage otherwise the garage door would have come down and they wouldn't have been able to get in. So I purposefully stayed in the center so the garage door wouldn't come down.

Officer Lichucki arrived and entered Dumstrey's garage through the door that was forcibly kept open by Officer DeJarlais's car.

¶114 The officers also entered the garage for the purpose of obtaining information. Lichucki testified that he entered the garage in order to begin "the investigation as far as what happened." As the majority explains, "Officer Lichucki questioned Dumstrey and observed his physical characteristics, including his swaying, slurred speech, glassy and bloodshot eyes, and the odor of intoxicants emanating from his person." Majority op., ¶18. He asked Dumstrey to perform three field sobriety tests and submit to a breathalyzer test.[6] Dumstrey refused and was arrested for operating while intoxicated.

¶115 The majority contends that no search occurred because Officer Lichucki arrested Dumstrey "based on observations of his physical characteristics without further invading his bodily

---

[6] The majority concedes that a blood draw is a search under the Fourth Amendment, but contends that no search occurred here because Dumstrey refused to submit to a breathalyzer test. Majority op., ¶20 n.5.

17

integrity." Majority op., ¶20. It incorrectly relies on the "plain view" doctrine, which allows police to seize evidence in plain view without a warrant under certain circumstances. Arizona v. Hicks, 480 U.S. 321, 325 (1987). However, the "plain view" exception does not apply when officers encroach on a protected area. See, e.g., Jones, 132 S. Ct. 945, 952 ("the officers in this case did more than conduct a visual inspection... officers encroached on a protected area.") (emphasis supplied).

¶116 The correct determination of whether a search occurred depends on whether the parking garage is curtilage. The majority's analysis is backwards because it concluded that no search occurred before determining whether the garage is curtilage. It disregards controlling Supreme Court precedent by ignoring the rule of Jones and Jardines that trespass onto a protected area in order to obtain information is a search in violation of the Fourth Amendment. See Jones, 132 S. Ct. at 949; see also Jardines, 133 S. Ct. at 1417. As set forth above, Dumstrey's garage is curtilage. Thus, the officers conducted a warrantless search in violation of the Fourth Amendment when they occupied a protected area of Dumstrey's home in order to obtain information.

¶117 In sum, for the reasons set forth above, I conclude that the parking garage here is curtilage. As a result, the warrantless intrusion into Dumstrey's locked underground parking garage, and the resulting search and seizure, violated

18

Dumstrey's Fourth Amendment rights.  Accordingly, I respectfully dissent.

¶118 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.